**TINDLE et al. v. HEINER, Collector of Internal Revenue.**

Circuit Court of Appeals, Third Circuit.
April 4, 1927.

No. 3594.

Internal revenue �override7(19)—Leasing by owner for years and subsequent sale of house held "transaction entered into for profit," and loss on sale held deductible from income (Revenue Act 1918, § 214 [a] [5] being Comp. St. § 6336⅛g).

Owner of a house worth on March 1, 1913, $120,000, and which though originally built as a residence for himself, had been abandoned as such and for a number of years had been rented, and continued to be until it was sold in 1920 for a less sum, *held* entitled to a deduction of the difference from gross income for that year under Revenue Act 1918, § 214 (a) (5), being Comp. St. § 6336⅛g, as a loss in a "transaction entered into for profit."

In Error to the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Action at law by James R. Tindle and another, executors of will of Philander C. Knox, deceased, against D. B. Heiner, Collector of Internal Revenue. From the judgment, plaintiffs bring error. Reversed.

For opinion below, see 17 F. (2d) 522.

James Walton, of Pittsburgh, Pa., for plaintiffs in error.

John D. Meyer, U. S. Atty., of Pittsburgh, Pa., A. W. Gregg, Gen. Counsel, Bureau of Internal Revenue, and Frederick W. Dewart, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for defendant in error.

Sachs & Caplan, of Pittsburgh, Pa., amici curiæ.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case centers around the word "transaction"— "transaction entered into for profit"—as used in the Revenue Act of 1918 (40 Stat. c. 18, § 214 [a] [5]; Comp. St. § 6336⅛g) in respect to losses allowed as deductions in income tax returns. What in point of fact is the transaction we are here dealing with? Was it one Congress meant to cover by this section? Viewed as an entirety the transaction involved is this:

In 1887–1888 the late Philander C. Knox bought ground in the city of Pittsburgh and built a residence thereon at a cost in all of $172,000. In 1920 he sold this property and residence for $73,706.79, so that, taken as a whole, the transaction, begun in 1887 and ended in 1920, constitutes a single whole from the viewpoint of buying and selling; but, when this single whole is considered from the standpoint of the use to which the property had, meanwhile, been put, it resolves itself into two distinct and wholly different transactions: First, the property was used by him as a residence; he built the house for that purpose, and so used it until 1901. This transaction was therefore a distinctively home, residential, one. In 1901, however, he entered into national public life, and gave up the property as a residence, and never afterward occupied it. He acquired a residence by living in a different ward of the city, and retained it up to the time of his death for occasional residential and seasonal voting purposes, and, as stated by counsel at the hearing, his regular winter residence was in Washington City, where he bought and occupied a home, and his summer residence in a home he owned at Valley Forge, Pa. With the ending of his occupation of his Pittsburgh home, he rented the same on long-term leases. His first lease was in October, 1901, for 3½ years, later for a term of 10 years, and thereafter for shorter terms, until the property was finally sold.

With the giving up of his residence, all sentimental connection in the use of the house as a home ended, and thereafter the use of the property was by others under lease from him, during the running of the first lease for 3 years, to wit, from October 1, 1901, and then from April 1, 1905, for 10 years. During the running of these leases he was, of course, unable to sell the property, by reason of the use he was making of it and the leases he had given for his own profit. Such being the status of the transaction, the ordinary one of owning real estate for leasing purposes, the situation of the property under the second or 10-year lease when the income tax law of 1913 was passed, was a distinctively nonresidential and a distinctively business leasing of real estate for profit. We think we are justified in regarding the transaction here involved by its then and subsequent status. The situation was in no wise different than it would have been, had he always owned and used the property for renting purposes, and never for residential purposes, because the residential use had finally and forever ceased at the time of the passage of the income tax law.

What, then, was the fact and status in money value of this property when the income tax law of 1913 was passed? It was a distinctively renting transaction, and in this transaction was involved the use for renting

of property of the agreed upon then value of $120,000. Any system of bookkeeping in this transaction would have had charged against it an investment of $120,000, represented by real estate, and the rents upon the same would have been profits. What, then, would have been the result of this transaction when it was finally closed? Clearly, instead of profits, a loss, represented by the shrinkage in value of the property during that time of $46,293.21.

But, assuming the situation was one where some might contend, as did the court below, that the language of Congress was intended to treat the transaction as a purchase and sale of property, without reference to what its use was during the interim, it seems to us the opposite view might very reasonably be taken of holding Mr. Knox's tenure as made up of two transactions—one, the residential one, which had ceased to exist long before, and to which the law did not apply; the other, a purely business venture, unfortunate in its results, but one which the law fairly contemplated should be offset against other items of income which the owner of the property sustained. It seems to us, therefore, with this double interpretation in the balance, that the law would then resolve that uncertainty against the government in favor of the taxpayer. Assured as we are that this latter transaction was one entered into and carried on for profit, the decedent in the assessment of his net income should have been allowed credit for the loss resulting therefrom.

The judgment below will therefore be reversed, with instructions to enter judgment for the taxpayer's estate.