**PHIPPS v. HELVERING, Com'r of Internal Revenue.**

**No. 7759.**

United States Court of Appeals for the District of Columbia.

Dec. 8, 1941.

Mr. David A. Reed, of Pittsburgh, Pa., for petitioner.

Mr. Edward Hopkins Hammond, Sp. Asst. to the Atty. Gen., with whom Messrs. Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., all of the Department of Justice, were on the brief, for respondent. Messrs J. P. Wenchel, Chief Counsel, and John M. Morawski, Sp. Atty., both of the Bureau of Internal Revenue, of Washington, D. C., also entered appearances for the respondent.

Before MILLER, VINSON, and EDGERTON, Associate Justices.

---

VINSON, Associate Justice.

This case raises a question of deductible loss under Section 23(e) of the 1932 Revenue Act, 26 U.S.C.A. Int.Rev.Acts, page 490, which provides, inter alia, that an individual may deduct from his gross income, losses incurred in trade or business, or incurred in any transactions entered into for profit.[1] The Commissioner and the Board of Tax Appeals did not allow a deduction.

Since 1904, the taxpayer, the Honorable Lawrence C. Phipps, has been buying, improving, renting, and selling real estate. His extensive holdings, for the most part, are in his own name or in that of a closely held corporation, in which he is, generally, the sole stockholder. He does not handle real estate for others; he is not a licensed broker; in fact, he does his own buying and selling through real estate agents. Nonetheless he carries on an active investment in real estate. Two years before he began these pursuits, he purchased a house and several lots on East Colfax Avenue, Denver, Colorado. He began immediate use of this newly purchased house as a residence. Through additional purchases, he became, in 1918, the owner of the frontage on the entire block where his home stood. In the Fall of that year he was elected to the United States Senate. When he began his duties in 1919, he left his Colfax home and took up residence in Washington, D. C. He moved a part of his furnishings out of his old home, but it remained habitable. By 1925 the neighborhood of this old home was becoming a business section and in that year was so zoned. Senator Phipps, meanwhile, was starting his second term in Congress. Also in that year he purchased a new home in Denver in his wife's name. He moved the remainder of the Colfax furnishings to his new Denver home, but the employment of a caretaker at the old home was continued. The Colfax house and lots were listed with real estate agents, and the taxpayer gave general instructions to sell. Subsequently, many propositions were considered; many died in the preliminary stages; some got well along; after a time there were attempts to develop and lease as well as to sell. Nonetheless, between 1925 and 1932 neither the house nor the lots were leased or sold. The taxpayer never charged off depreciation on the house. In 1932 the house was demolished to eliminate maintenance costs, particularly taxes.

After taxpayer filed his 1932 return, the Commissioner mailed him a deficiency notice. In response, the taxpayer petitioned the Board of Tax Appeals for redetermination of the deficiency, and alleged, in addition, overpayment. The Board found no deficiency, from which there is no appeal. The Board also found no overpayment, which is questioned by this appeal.

The alleged overpayment is predicated upon taxpayer's claim that he is entitled to a deduction under Section 23(e), either on a loss incurred in trade or business, or on a loss incurred in a transaction entered into for profit. For the purposes of this discussion, there should be set opposite to Section 23(e) with these allowable deductions, the provision that no deductions are permitted for personal, living, or family expenses.[2]

This house was purchased and used as a home. The purchase, the construction, the tearing down, or the sale of a home normally represents a personal, family, or living expense.[3] Thus before

---

[1] "§ 23. Deductions from Gross Income

"In computing net income there shall be allowed as deductions: * * *

"(e) Losses by Individuals. * * * losses sustained during the taxable year and not compensated for by insurance or otherwise—

"(1) if incurred in trade or business; or

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * *"

[2] "§ 24. Items not Deductible

"(a) General Rule. In computing net income no deduction shall in any case be allowed in respect of—

"(1) Personal, living, or family expenses; * * *." 26 U.S.C.A. Int.Rev. Acts, page 494.

[3] Article 171 of Regulations 77 promulgated under the Revenue Act of 1932 provides: "* * * Losses must usually be evidenced by closed and completed transactions. * * * *A loss on the sale of residential property* purchased or constructed by the taxpayer for use as his personal residence and so used by him up to the time of the sale *is not deductible.* Where, however, property so purchased or constructed is prior to its sale *rented or otherwise appropriated to income-producing purposes* and is used for such purposes up to the time of its sale, *a loss* from the sale of the property [*is allowable,* to be computed in a certain fashion] * * *". (Italics supplied.)

any dealing with a home can constitute a deductible loss, some transaction or some series of events must occur which incarnates the house as a business institution.

This change of character, this conversion to a business property, is necessary, counsel's contentions notwithstanding, to obtain a deduction for a loss incurred either in regular "trade or business", or in a single "transaction entered into for profit". While the cases, for the most part, have developed the appropriated-to-a-business-use test when dealing with the single transaction,[4] the test is just as appropriate when there is a claim for a loss in regular business.[5] The critical showing at the outset is not into what deductible subsection the loss is to be placed, but that it has been removed from the nondeductible personal, living, or family expense classification. Whether the property has been removed from this nondeductible classification is the very essence of the appropriated-for-a-business-use test.

■ This showing remains critical, where as here, the taxpayer carries on an active investment in real estate. It is nothing that the taxpayer may give a business character to most of his holdings. The character of this particular house, which was purchased and used as a home, must change.

Taxpayer contends that the metamorphosis took place in '25 when he moved the remaining furniture out and placed the house and lots in the hands of real estate brokers for sale. From that time on elaborate proposals and counterproposals were made. But a vigorous attempt to sell your personal holdings does not convert them into business inventories.[6] The taxpayer's real estate agents spent much time in sales-

manship, showing potential buyers how the property could be fixed up for business purposes. But a seller's interest in a business appropriation by *others* is not an act of conversion by *him*.

It seems that after a time, with the house and lots still on his hands, the taxpayer became interested in improving the property himself, and then becoming a lessor. Cogitation is not enough, but such plans *sufficiently acted upon would be* a transaction or a series of events constituting an appropriation to a business use. In this connection taxpayer makes his strongest bid. A real estate agent representing an interested party came to taxpayer's agent with a proposal whereby the taxpayer would erect a large cinema house and then become a lessor. The taxpayer through his agent outlined a counterproposal, certainly not complete in detail. It was testified that an "agreement" was reached, but the taxpayer admitted that it probably was *not legally binding.* While the evidence is none too definite, the exhibits show, we believe, that although negotiations went much further than usual, there was clearly never any contract that obligated the taxpayer to construct a building and to become a lessor. Chronologically, the last exhibit on this transaction is a telegram by the taxpayer to his brokers congratulating them on obtaining an acceptance of his counterproposal but containing this significant statement, "Lease must be signed and cash deposit made before we incur any obligation."[7] Before that materialized, we are told, the failure to obtain first-run pictures caused the whole deal to "blow up".

Thus, this strongest item of evidence clearly fails to show an appropriation for a business use. The record reveals many

---

[4] Heiner v. Tindle, 276 U.S. 582, 48 S. Ct. 326, 72 L.Ed. 714; Tindle v. Heiner, 3 Cir., 18 F.2d 452; Schmidlapp v. Comm'r of Internal Revenue, 2 Cir., 96 F. 2d 680, 118 A.L.R. 297; Rumsey v. Comm'r of Internal Revenue, 2 Cir., 82 F.2d 158; Morgan v. Comm'r of Internal Revenue, 5 Cir., 76 F.2d 390; Hamilton v. Comm'r of Internal Revenue, 30 B.T. A. 160.

[5] Compare Peck v. Comm'r of Internal Revenue, 34 B.T.A. 402. Compare similar reasoning in a § 23(a) case (ordinary business expense), Cecil v. Comm'r of Internal Revenue, 4 Cir., 100 F.2d 896, 899; also, see Paine v. Comm'r of Internal Revenue, 1 Cir., 102 F.2d 110.

[6] Rumsey v. Comm'r of Internal Revenue, 2 Cir., 82 F.2d 158; Morgan v.

Comm'r of Internal Revenue, 5 Cir., 76 F.2d 390. But see Larkin v. Gage, D.C. N.Y., 28 F.2d 78.

[7] The text of the telegram: "Congratulations on your success please have Hughes and Dorsey prepare contract and lease submitting same to me in preliminary form stop what rate of interest on the deposit of $43,500 will be satisfactory to lessee I cannot secure a six percent return on good securities stop all building plans and specifications must be subject to our approval stop what architect is favored by lessee stop lease must be signed and cash deposit made before we incur any obligation stop I understand we are to remove present building from premises stop all well."

attempts to sell, develop and rent, but these acts are several negotiations—not a series of related events with accumulating weight so that at last it could be said there was conversion.

The taxpayer indicates, however, that starting around 1925 he had "in mind" that the house was no longer home, but a part of his real estate investments, and argues that these several negotiations bear out his suggested intent. As we have already stated, intent must be fortified by acts, but upon the former score alone the commissioner points out that not only did the claim for deduction fail to come to the taxpayer's mind when he first reported his income for 1932, but also that at no time from 1925 to 1932 did he charge off depreciation on this "business house", although he was unquestionably familiar with such deductions in view of his extensive real estate holdings. Such facts are by no means conclusive, and would in no way weaken an actual conversion, but they are fairly persuasive in response to taxpayer's suggested intentions.

The several negotiations elaborated upon by the taxpayer show the interesting history of trying to dispose of a fine, large, old residence, but never a transaction or a series of events that turned the home and its surrounding lots into a business house, before its voluntary demolition in 1932.

Affirmed.