GERALDINE R. MANN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mann v. Commissioner
Docket Nos. 2365-71, 2366-71, 2367-71.
United States Tax Court
T.C. Memo 1975-74; 1975 Tax Ct. Memo LEXIS 302; 34 T.C.M. (CCH) 377; T.C.M. (RIA) 750074; March 24, 1975, Filed James E. Mann, pro se. Allen D. Hill, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: Docket
Taxable
Number
Year
Deficiency
Geraldine R. Mann
2365-71
1967
$ 883.16
Geraldine R. Mann
2365-71
1968
1,135.00
Geraldine R. Mann
2365-71
1969
561.00
James E. Mann
2366-71
1967
751.16
James E. Mann
2366-71
1968
1,073.00
James E. Mann
2366-71
1969
484.00
James E. Mann and
2367-71
1964
3,443.37
Geraldine R. Mann
*304 The cases were consolidated for trial, briefs and opinion. The principal issue is whether losses sustained in connection with a loan, a guarantee and an advance to a corporation of which Petitioner James E. Mann owned 50 percent of the stock, are deductible as business bad debts under section 166(a)(1)[2] and, therefore, available for the carryback benefits of section 172 or, in the alternative, deductible only as section 166(d) nonbusiness bad debts subject to the limitations imposed upon short-term capital losses. Also involved is substantiation of miscellaneous itemized deductions. Other adjustments made by the Commissioner in his statutory notices of deficiency are not contested. *305 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits are incorporated by reference. Petitioners James E. Mann and his wife, Geraldine R. Mann, resided in Arcadia, California when the petitions were filed. Because the activities under review are those of James E. Mann, subsequent references to "petitioner" shall refer to him. Petitioners filed separate individual Federal income tax returns for the taxable years 1967, 1968 and 1969, and amended returns for the taxable year 1967 with the district director of internal revenue, Los Angeles, California. On May 29, 1968, petitioners applied for a refund of income tax for the taxable year 1964 based upon a tentative carryback adjustment for a net operating loss for the taxable year 1967. Petitioners were refunded $3,446 pursuant to the claim. Petitioners filed their joint Federal income tax return for the taxable year 1964 with the district director of internal revenue, Los Angeles, California. In June of 1957 petitioner acquired 20 percent of the outstanding stock of Meridian Carpet Mills. On or about the same date Meridian employed petitioner as general manager and sales *306 representative under a written contract at an annual salary of $7,200, subject to periodic increases. Petitioner considered the employment contract to be a condition precedent to the purchase of the Meridian stock. Thereafter, in 1958, petitioner increased his stock ownership in Meridian to 50 percent. The total cost of petitioner's stock of Meridian was $11,600. Meridian was a tufter of carpets rather than a fully integrated manufacturer. As such, Meridian relied upon outside contractors to provide needed processing, such as the dyeing, trimming and finishing of the tufted materials prior to the marketing of a finished product by Meridian. One such processor engaged by Meridian was California Carpet Finishing Co. In May of 1961, petitioner purchased 25 percent of the outstanding stock of California Carpet for $12,500 intending to insure the continued availability of its processing services for Meridian's tufted materials. As time progressed, Meridian and California Carpet became highly dependent upon the services and needs of each other with aggregate income for 1963 through 1965 to California Carpet from Meridian constituting 73 percent of its income. Petitioner viewed the carpet *307 industry in the Los Angeles area as being composed of a few small companies owned primarily by stockholder-employees. Accordingly, petitioner believed his chances of employment outside Meridian to be slight due to the closed nature of the trade and such probabilities were further limited by the general decline in the building and construction industry, upon which the carpet industry was highly dependent. Petitioner was vice president and a member of the board of directors of Meridian and was president and general manager of California Carpet. His responsibilities to Meridian included being production coordinator between Meridian and California Carpet which required extensive duties with California Carpet for which Meridian was reimbursed to the extent that petitioner's activities inured to the benefit of California Carpet. Although petitioner's titles indicated executive capacities, such positions were in name only and his primary responsibilities involved him in all facets of the physical labor required by Meridian and California Carpet. From 1964 through 1969, petitioner's sole source of income, except for nominal amounts, was from services rendered to Meridian or California *308 Carpet or a combination of both as follows: Salary From
Salary From
Total Year
Meridian
California Carpet
Salary
1964
$12,200
$14,300
$ 26,500
1965
13,000
14,300
27,300
1966
11,066
16,125
27,191
1967
0
14,200
14,200
1968
0
14,000
14,000
1969
0
17,846
17,846
Late in 1964 Meridian experienced difficulties with the quality of dyed yarn from one of its suppliers. Dissatsfied customers and a supplier demanding to be made whole forced Meridian into financial straits. At such time the inventory, accounts receivable and machinery were factored to L. F. Dommerich and Co. Being advised that Meridian's credit rating would be in jeopardy if it challenged the demands for payment from the supplier, Meridian sought an alternative method of coping with its cash-flow problem. To this end, petitioner advanced Meridian $15,000 and received in return an unsecured 6 percent demand note dated November 13, 1964. As matters grew worse, the factor, L. F. Dommerich and Co., grew apprehensive of the financial state of Meridian. Refinancing was sought and an arrangement to replace L. F. Dommerich and Co. with James Talcott Inc., as factor was negotiated *309 on December 12, 1965. Talcott was reluctant to accept the substitution without additional security as all of Meridian's receivables, inventories and equipment had been pledged to secure loans to provide working capital. Petitioner, therefore, executed a guaranty agreement with Talcott and pledged his California Carpet stock (25 percent of the outstanding stock) as collateral. His basis in the pledged stock was $12,500. On January 14, 1966, petitioner caused the Bank of America to charge $11,000 to his personal checking account to cover outstanding checks of Meridian. No notes were issued by Meridian in favor of petitioner for the $11,000 advance as the parties intended repayment in a matter of days or weeks. On December 14, 1966, James Talcott, Inc., took possession of all the assets of Meridian and foreclosed on petitioner's stock in California Carpet. In February 1967, Meridian was liquidated and petitioner received nothing in repayment of his loans or advances to Meridian. None of petitioner's loans or advances to Meridian was repaid. On their separate income tax returns for the taxable year 1967 petitioners each deducted $13,000 as their respective community shares of loans *310 and advances made by petitioner to Meridian and on such returns they claimed the standard deduction in lieu of itemized deductions. Petitioners filed amended separate income tax returns for the taxable year 1967 shortly before the Commissioner issued his statutory notices of deficiency which were not examined by the Commissioner prior to the mailing of the statutory notices of deficiency. On the amended returns petitioners each claimed their one-half community shares of the following itemized deductions: CHARITABLE CONTRIBUTIONS:
Shepherd of the Hills Lutheran Church
$ 641
Pacific South West Lutheran
57
University of Southern California
30
Other
60
$ 788
TAXES:
Automobile
$ 48
Sales Tax
142
Automobile licenses--3
155
Gasoline
96
Real Estate Tax on home
836
Disability insurance
84
State Income Tax
474
1,835
INTEREST:
Western Mortgage Co.
$1,578
Bank of America
347
1,925
MISCELLANEOUS:
Income tax preparation
$ 40
Legal fees on investments
140
180
TOTAL
$4,728
Respondent concedes that petitioners are entitled to their respective community shares of the following itemized deductions for the taxable year 1967: *311 CHARITABLE CONTRIBUTIONS:
Shepherd of the Hills Lutheran Church
$ 591.00
Mount Olive Lutheran Church
5.00
Lutheran Women's Association
58.50
American Friends Service Commission
2.50
University of Redlands
50.00
University of Southern California
30.00
Monrovia Police Association
4.00
$ 741.00
TAXES:
Real estate
$ 836.00
State income taxes
425.00
$1,261.00
INTEREST--MORTGAGES
$1,578.00
TAX PREPARATION FEE
40.00
$3,620.00 In addition, petitioners each increased the deductions claimed for advances and loans to Meridian from $13,000 to $19,250. The Commissioner, in his statutory notices of deficiency, disallowed the losses claimed on the original returns for advances and loans to Meridian of $13,000 each on the grounds that they represented nonbusiness bad debts. The Commissioner also issued a statutory notice covering petitioners' joint return for the taxable year 1964 in which he disallowed the claimed net operating loss for the taxable year 1967. ULTIMATE FINDINGS 1. Petitioner was engaged in the trade or business of being a corporate officer and employee. 2. Petitioner's advances and guarantee to Meridian were *312 proximately related to his trade or business of being a corporate officer and employee. 3. Petitioner's dominant motivation for making the advances and guarantee to Meridian was to insure his continued employment and salary. OPINION Petitioners contend that their aggregate loss of $38,500 constitutes a business bad debt and is, therefore, deductible in full under section 166(a)(1). In substance, they claim that the desire for job security, in terms of continued employment and salary, was the dominant motivation which prompted the indebtedness. Respondent does not challenge the worthlessness of the debts nor the time of worthlessness. No claim is made as to the possible characterization of the advances as contributions to capital. Respondent's contention is directed at the nature of the relationship between petitioner and the losses. Respondent contends that petitioner's dominant motivation for the advances was the protection of his capital investment in Meridian rather than the protection of his salary as an employee of Meridian. It is immaterial whether the obligations arose by operation *313 of the law of subrogation or were direct advances as both are accorded equal dignity as "debts" within the meaning of section 166. Putnam v. Commissioner,352 U.S. 82 (1956); United States v. Hoffman,423 F.2d 1217 (C.A. 9, 1970); Robert E. Gillespie,54 T.C. 1025, 1031 (1970), affirmed by unpublished order (C.A. 9, 1972). Accordingly, the loan, guarantee and advance shall at times be collectively referred to as advances. In claiming a 166 (a) (1) business bad debt deduction, petitioner must establish first that he was engaged in a trade or business. If we find such trade or business, we must determine if there is a direct relationship between the advances from which the losses arose and the trade or business engaged in by the taxpayer. Estate of Martha M. Byers,57 T.C. 568, 577 (1972); Oddee Smith,55 T.C. 260, 268 (1970), vacated and remanded per curiam 457 F. 2d 797 (C.A. 5, 1972).[3] The real point of contention then centers on petitioner establishing the requisite proximate *314 connection between his business and the loss. Sec. 1.166-5(b), Income Tax Regs.
Petitioner does not contend that he was engaged in the trade or business of money lending or financing corporations. Instead, he contends and we find that the rendering of his services to Meridian in exchange for a salary constituted a trade or business. George P. Weddle,39 T.C. 493, 496 (1962), affd. 325 F.2d 849 (C.A. 2, 1963). The degree and nature of petitioner's employment activities with Meridian and his salary elevate his relationship with Meridian beyond mere investment to the status of being in the trade or business of a corporate officer and employee. The initial direct relationship between the advances and petitioner's trade or business is adequately supported. The record clearly reflects that had Meridian not satisfied its suppliers' demands to be made whole or had it failed to negotiate a new factor Meridian would have gone out of business, and petitioner's employment thus terminated. The focal point is whether petitioner has satisfied the dominant motivation *315 test enunciated in United States v. Generes,405 U.S. 93 (1972). A bad debt is created or acquired (as the case may be) in connection with the trade or business of being an employee who is a shareholder if the dominant motivation for the acquisition of the debt was the protection of employment rather than protection of investment. Petitioner's dual status as shareholder [4] and employee demands that the degree of motivation be subject to the rigors of dominancy rather than mere significance; yet, it is not necessary that it be the sole motivation. We find that petitioner has satisfied his burden and that his dominant motivation for making the advances to Meridian was to insure his continued employment and salary. *316 Initially, petitioner testified that job security and the retention of employment were the dominant factors motivating the advances. [5] Cognizant of the admonition of Generes,supra at 106, respecting such talismanic chants, we apply an objective test to examine such self-serving statements. For purposes of determining the source of petitioner's salary, we view the combined amounts received from Meridian and California Carpet as one source. The fact that petitioner acted as a production coordinator between Meridian and California Carpet required that his services be rendered for both entities. The reimbursement of Meridian by California Carpet for the services inuring to the benefit of California Carpet and the dependency of the latter upon Meridian for a considerable proportion of its sales all tend to support the view that petitioner had *317 only one source for his $27,000 average annual income for the taxable years in question. Comparing petitioner's circumstances with those of the taxpayer in Generes, we find petitioner expended his full-time efforts to earning his salary; whereas, Generes devoted a minimal 6 to 8 hours a week to the salary he allegedly sought to protect. Similarly, the $12,000 Generes sought to protect by his loans represented only 30 percent of his gross income as compared to 100 percent of petitioner's gross income. In his concurring opinion in Generes, Justice Marshall emphasized the importance attached to the presence of an alternative source of income in determining the lack of employment-related dominant motivation: In view of all the facts set forth in the opinion of the Court, especially the fact that the taxpayer had a gross income of approximately $40,000, I have no doubt whatever that the same jury would have found that the taxpayer's "primary and dominant" motivation was to protect his investment, not his salary. (405 U.S. at 111.] [Emphasis added.] We are equally impressed by the situation of a taxpayer looking to one source of income for his livelihood. *318 The lack of an alternative source of income coupled with the distinct possibility that petitioner might not find other employment in his trade supports the importance placed upon the retention of employment. [6]
The common sense aversion in Generes to reasoning that a taxpayer would expose himself to a potential liability of $2,000,000, which in fact resulted in bad debt losses of $160,000, to protect an after-tax salary of $7,000 which was less than one-fifth of his original stock investment of $38,900, is found wanting here. The Court in Generes noted the lack of the actual value of the Generes equity interest prior to the corporate misfortunes. It seems reasonable to infer from the magnitude of the amounts at risk that Generes looked for his *319 gain from the guarantee in terms of the further appreciation of his investment as opposed to the continuation of his relatively nominal salary. Petitioner, on the other hand sought to protect an annual after-tax salary in 1964 of $22,000 [7] by advancing $38,500 on an investment of $11,600. [8] The disparity between petitioner's annual after-tax salary of $22,000 and an investment of $11,600 tends to show motivation toward the protection of the salary. *320 Based upon Oddee Smith,60 T.C. 316, 319 (1973), modifying 55 T.C. 260 (1970), vacated and remanded 457 F.2d 797 (C.A. 5, 1972), respondent urges that a numbers comparison is not the proper standard for determining dominant motivation. As repayment of the advances was expected, we do not believe we are faced with the situation of a taxpayer pouring good money after bad in an attempt to recoup his investment. On that basis, and the fact that the taxpayer in Smith sought to protect his credit rating and did not receive a salary from the debtor-corporation, Smith is distinguishable. To be sure, we do not intend a mere numerical test to be controlling, but we cannot ignore the objective and credible support such figures lend to what otherwise might well be characterized as "mere self-serving statements." Nor can we ignore the importance placed on such figures by the Supreme Court in its application of a standard which demands the trier of fact to "compare the risk against potential reward and give proper emphasis to the objective rather than to the subjective." [9] [Emphasis added.] *321 The potential rewards to petitioner from risking the $38,500 were not in terms of investment appreciation. Meridian's need and use of the loan and advance was directed toward momentary working capital and honoring outstanding checks. The guarantee expedited refinancing. The funds were not used for capital improvements, expansion or as the regular method of financing daily operations wherein the expectation of investment appreciation is generally found. [10] On this point, Robert E. Gillespie, 54 T.C. 1025 (1970), affirmed by unpublished order (C.A. 9, 1972), denying a business bad debt deduction, is helpful by way of distinction. The taxpayer in Gillespie, together with other shareholders, adopted a policy to guarantee funds for a number of corporate acquisitions and to provide long-term working capital as a regular and continuous means of financing--a function usually accomplished by equity capital. Debentures were guaranteed to provide long-term financing. A 10-year leasehold was guaranteed. A "floor plan" form of financing inventory was guaranteed. The extent of such activities and the nature of the transactions were too closely related to the investment motive *322 to be for the dominant purpose of protecting employment. In contrast, the advances by petitioner were intended to alleviate temporary circumstances and were not part of a pattern to support equity-related transactions. Petitioner's initial acquisition of Meridian stock and his insistence upon an employment agreement prior to the consummation of the purchase is indicative of his dominant motivation at that time. We have no reason to doubt that the degree of such motivation remained in force when the advances were made. Quite to the contrary, we find no indication that the retention of the stock was justified by any of the incidents of a sound *323 investment. There is no record of any dividends in the past nor, in lieu thereof, any indication of excessive compensation. Likewise, petitioner's undisputed testimony that his Meridian stock was never offered for sale or that he even considered the sale of his stock instead of advancing funds supports the conclusion that petitioner's primary and dominant motivation, initially and throughout the period of the advances was in terms of employment protection rather than an investor seeking a return on, or a recoupment of, his investment. On his returns for 1967 petitioner claimed his cost in the Meridian stock to be $11,600. Respondent argued on brief that his cost was $38,344 because of liabilities assumed but does not concede this to be the amount deductible if we found the loss to be deductible as an ordinary loss. As we interpret the agreement covering petitioner's purchase of the stock and because petitioners do not claim their cost to be in excess of $11,600, we find the cost to be $11,600. Petitioners claimed their respective community property shares of itemized deductions on their amended returns for 1967 which returns were not examined by the Commissioner prior to his mailing *324 of the statutory notice of deficiency for that year. The following schedule reflects the total amounts claimed, the amounts conceded by respondent on brief to be allowable and the amounts in issue here: Amount
Amount Conceded
Amount
Claimed
by Respondent
in Issue
CHARITABLE CONTRIBUTIONS:
Shepherd of the Hills Lutheran Church
$ 641.00
$ 591.00
$ 50.00
Pacific South West Lutheran
57.00
0
57.00
University of Southern California
30.00
30.00
0
Mount Olive Lutheran Church
5.00
Lutheran Women's Associations
58.50
American Friends Service Commission
2.50
University of Redlands
50.00
Monrovia Police Association
4.00
Miscellaneous--not identified on return
60.00
60.00
TAXES:
Automobile
48.00
0
48.00
Sales Tax
142.00
0
142.00
Automobile licenses - 3
155.00
0
155.00
Gasoline
96.00
0
96.00
Real estate tax on home
836.00
836.00
0
Disability insurance
84.00
0
84.00
State income tax
474.00
425.00
49.00
INTEREST:
Western Mortgage Co.
1,578.00
1,578.00
0
Bank of America
347.00
0
347.00
MISCELLANEOUS
Income tax preparation
40.00
40.00
0
Legal fees on Investments
140.00
0
140.00
TOTALS
$4,728.00
$3,620.00
$1,228.00
*325 Respondent's concessions are not identified in the same manner as the deductions claimed on the return; nevertheless, it is apparent that there is a net disallowance of $47 for charitable contributions. Petitioners contend such amount represents cash free will offerings made by their children at church. On the basis of the record, we conclude that such offerings were allowed by respondent in his concessions. The $47 is, therefore, not allowed. The state income tax claimed of $474 is supported in the record and allowed in full as is the interest expense to Bank of America in the amount of $347. Petitioner's canceled checks support aggregate payments of $185 to the California Department of Motor Vehicles for the registration and licensing of three vehicles. An ad valorem auto license fee is deductible as a personal property tax under section 164(a) (2) but an annual flat registration fee is not deductible. Sec. 1.164-3(c), Income Tax Regs.California imposed both for the year in question. [11] The registration fee was $10 for each vehicle, therefore, the deduction *326 of $155 is, therefore, deductible. The legal fees claimed are disallowed because petitioner failed to prove that the payee was an attorney and that the services rendered by the attorney permit deductibility under section 162 or section 212. Evidence on the remaining itemized deductions was not offered and the burden of proof was on petitioners to establish deductibility. They are, therfore, not allowed. Decisions will be entered under Rule 155.
Footnotes
1. The following cases are consolidated: James E. Mann, docket No. 2366-71; James E. Mann and Geraldine R. Mann, docket No. 2367-71.↩
2. All section references are to the Internal Revenue Code of 1954 in effect during the taxable years in issue. SEC. 166. BAD DEBTS. (a) GENERAL RULE.-- (1) WHOLLY WORTHLESS DEBTS.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) PARTIALLY WORTHLESS DEBTS.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * * * (d) NONBUSINESS DEBTS.-- (1) GENERAL RULE.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) NONBUSINESS DEBT DEFINED.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. On remand, see Oddee Smith,60 T.C. 316↩ (1973).
4. It has often been held that the presence of large shareholdings does not preclude finding the requisite proximate connection between a trade or business and incurring a business debt. See J. T. Dorminey,26 T.C. 940 (1956), (major shareholder); Tony Martin,25 T.C. 94 (1955), (25 percent shareholder); Isidor Jaffe,T.C. Memo 1967-215, (50 percent shareholder), and Ida Rosati,T.C. Memo 1970-343, (at least 64 percent), both cited with approval in United States v. Generes,405 U.S. 93, 101↩ (1972).
5. As related by petitioner: * * * of course, the thing that goes through your mind immediately is, as far as I was concerned as the case with all of these, is, gosh all mighty, I've got a wife and three children to support. I've been earning $27,000.00 a year and if this [goes] under, there goes my job. What am I going to do?↩
6. The ability to secure like employment has been considered to be of aid in establishing the requisite proximate relationship. See Isidor Jaffe,T.C. Memo 1967-215, cited with approval in United States v. Generes,405 U.S. 93, 101 (1972); Estate of Kent Avery,T.C. Memo 1969-64↩.
7. Assuming a tax rate of 34 percent on gross income of $27,000 with five exemptions and the standard deduction. Secs. 2(a) and 1(a)(1). See United States v. Generes,405 U.S. 93, 107-108↩ (1972). 8. We are unable to conclude as to the true value of petitioner's interest in Meridian for the years in question. Respondent urges on brief, and we agree, that the relevant figure for purposes of comparison, when available, is actual value and not investment cost. Respondent contends that petitioner's share of the book value of Meridian for 1964 and 1965 determined from the financial statements, was $65,000 and $51,000, respectively. As the Court in Weddle v. Commissioner,325 F.2d 849, 851 (C.A. 2, 1963), affirming 39 T.C. 493↩, we hesitate to equate book value and actual value especially when Meridian had losses for 1964 and 1965.
9. See United States v. Generes,405 U.S. 93, 104↩.
10. See e.g. United States v. Generes,supra, (a blanket indemnity agreement for construction bid and performance bonds); Estate of Martha M. Byers,57 T.C. 568 (1972), (extensive history of personal loans to corporate customers); Loventhal v. United States,346 F. Supp. 1318 (M.D. Tenn., 1972), (business acquired by thinly capitalized corporation personally guaranteed); Joel Rosenbaum,T.C. Memo 1973-076↩ (method of capitalization through series of loans).
11. Cal. Rev. & Tax Code, sec. 10752 (West 1970), (License fee); Cal. Veh. Code, sec. 9250↩ (West 1971), (Registration fee).