ALVIS and ALEITA KACZMAREK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Kaczmarek v. Commissioner
Docket No. 5850-73.
United States Tax Court
T.C. Memo 1975-358; 1975 Tax Ct. Memo LEXIS 18; 34 T.C.M. (CCH) 1551; T.C.M. (RIA) 750358; December 18, 1975, Filed L. Cuttone, for the petitioner. T. G. Schleier, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Amount
1965
$5,458.00
1966
4,414.13
1968
319.00
1969
2,121.31 [1]/
Other issues having been disposed of by mutual agreement, the two issues remaining for decision are: (1) whether funds advanced by petitioner to his closely held corporation qualify as business bad debts in 1968 under section 166, [2] and (2) whether petitioner is entitled to deduct as a business loss under section 165 the loss on the sale of his Itasca residence in 1968. *20 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Alvis and Aleita Kaczmarek, filed joint income tax returns for the years 1965, 1966, 1968 and 1969. Petitioners resided in Lisle, Illinois at the time they filed their petition. Aleita Kaczmarek is a party only by virtue of having filed a joint income tax return with her husband. Alvis Kaczmarek will be referred to herein as petitioner. 1. Loans to National.
Petitioner played soccer in Europe in his youth, and his interest in soccer continued after he moved to the United States in 1949. Subsequently, he played, coached, managed and was president of local Chicago amateur soccer teams. At various times he also promoted the tours of visiting international soccer teams. Prior to 1967 petitioner worked as a salesman and estimator of structural and ornamental steel, and eventually owned and operated his own small specialty steel company which he sold in 1966. In 1966 petitioner became interested in organizing a professional soccer league in the United States. In August of 1966 petitioner and a Mr. William Cutler organized an Illinois corporation named the Chicago National Professional *21 Soccer League Club, Inc. ("National"). Its principal business activity was the operation of a professional soccer team called the Chicago Spurs. Initial plans called for Mr. Cutler to buy 400 shares in National, a Mr. Michael Butler 400 shares, another individual 100 shares, and petitioner 100 shares. Butler and the third individual, however, decided to withdraw. Cutler bought his allotted number of shares for which he paid $80,000, and petitioner increased his subscription to 200 shares, for which he paid $40,000. Petitioner also paid, in proportion to his stock ownership, a certain amount of the league franchise fee, the requisite performance bond, and other expenses of formation. In the following year, the corporation drafted and distributed at least one prospectus encouraging additional individuals to become shareholders. However, no more stock was sold. Petitioner did not buy additional shares, due to a shortage of funds. From August 1966 until December 1967 petitioner worked to create a functioning soccer team. He rented an office, hired office personnel, hired players, rented a stadium, trained the team, and performed various other duties in his role as general manager, *22 coach, and president of National. The Chicago Spurs won the league championship in 1967. Petitioner had an oral employment agreement with National, the substance of which is unclear. From August to December, 1966, National paid petitioner $6,250. For the taxable year 1967, the corporation paid petitioner $13,750. Petitioner had received compensation of $24,150 in 1965 from his previous employment. On January 20, 1967, petitioner advanced $50,000 to National. This advance was evidenced by a promissory note signed on behalf of the corporation by William Cutler and petitioner. The purpose of the $50,000 advance was to satisfy National's current lbligations and thereby insure its continued existence, at least until the commencement of the soccer season in April 1967. Between January 20 and December 31, 1967, petitioner made additional advances to National totaling $19,646.05. In the latter part of 1967, certain individuals representing the Kansas City Soccer Club, Incorporated, ("Kansas City Soccer") a Missouri corporation with its offices located in Kansas City, Missouri, contacted petitioner and Cutler and offered to purchase National's stock with the intention of bringing the *23 Chicago team to Kansas City. Due to the severe financial problems which confronted National, petitioner and Cutler agreed to sell National's stock to Kansas City Soccer. For their stock, Cutler received cash, and petitioner received a four-year employment contract with Kansas City Soccer, commencing January 1, 1968. He was to act as general manager of the Kansas City Spurs at an annual salary of $25,000, plus 20 percent of net profits. However, due to certain problems between petitioner and the new management, he worked for them for only part of 1968. The total compensation petitioner received from Kansas City Soccer was $10,764. In subsequent years petitioner began a new employment. He traveled to Europe ona part-commission part-salary basis, to hire skilled workers for American employers and h3ckey players for the Chicago Blackhawks. His combined compensation was greater than his salary from National. Petitioner's $50,000 advance to the corporation on January 20, 1967, and his numerous other advances to the corporation made between January 20 and December 31, 1967, aggregating $19,646.05, all became worthless on January 1, 1968. Petitioner in his 1968 income tax return claimed *24 a business bad debt deduction for his loans to National. Respondent allowed the claim only as a nonbusiness bad debt. 2. Sale of Itasca Residence.
Prior to 1965 petitioner had owned, jointly with his brother, two ten-unit apartment buildings. His brother wished to withdraw from the arrangement and persuaded petitioner to sell the buildings. However, they were able to find only one purchaser, and this individual was only interested in an exchange of properties. In May 1965, petitioner and his brother traded their two buildings for a parcel of land in Florida, a house in Itasca, Illinois, and some notes. The Itasca residence was old and in need of renovation, but it possessed a desirable location fronting on a golf course and was near petitioner's place of employment. The fair market value of the residence at the time of the exchange was approximately $55,000. Petitioner, acting as his own general contractor, commenced renovation in May 1965, completing the work in November 1966. The renovation, including the construction of a heated swimming pool, cost $24,861. Petitioner and his family moved into the house in October 1965. Vandals had inflicted some damage to the residence *25 prior to October 1965, and petitioner hoped to stop such destruction by occupying the house. Even before beginning the renovation, petitioner had discussed the possibility of sale with several brokers. The property was first listed for sale in May 1966, and in September 1967 the property was listed with a large real estate firm at a selling price of $79,000. In February 1968 the firm found a buyer who would pay $69,000, and a sales contract was signed. Closing costs totaled $5,009. Petitioner's loss on the sale of the house was $15,870. Petitioner's family remained in the house until September 1968. Petitioner himself had moved to Kansas City, Missouri in the fall of 1967 to begin new employment. Petitioner did not attempt to rent the Itasca residence at any point during his period of ownership. Although petitioner claimed depreciation deductions on his tax returns for certain apartment buildings in 1966, he did not claim any such deduction for the Itasca residence for the taxable years 1965, 1966 and 1968. 2a
Petitioner claimed as a deduction on his 1968 return the loss on the sale of the Itasca *26 residence. Respondent disallowed the claimed loss in its entirety. ULTIMATE FINDINGS OF FACT Petitioner's predominant motive in advancing funds to National during the calendar year 1967 was to protect his investment in National rather than to protect the salary he would receive as an employee of National. Petitioner did not acquire the Itasca property in a profit-motivated transaction, nor did he subsequently convert the property to profit-oriented uses. OPINION 1. Loans to National.
Petitioner and one William Cutler formed the Chicago National Professional Soccer League Club, Inc. in August 1966. The corporation's principal business was the operation of a professional soccer team called the Chicago Spurs. Cutler owned two-thirds of National's stock, and petitioner owned the remaining one-third, for which he paid $40,000. Petitioner as president of National was a salaried employee. During 1967 petitioner advanced $69,646 to National. This debt became worthless in 1968, and on petitioner's and his wife's joint return for 1968 they deducted the advances as business bad debts. Respondent contends that the advances petitioner made to National during 1967 are nonbusiness *27 bad debts within the meaning of section 166(d), and we agree. Section 166(a) [3] allows a deduction for any debt that becomes worthless within the taxable year. However, section 166(d) [4] provides that in the case of an individual taxpayer, section 166(a) shall not apply to a nonbusiness bad debt. Instead the loss from a nonbusiness bad debt shall be considered a loss from the sale or exchange of a capital asset held for not more than 6 months (i.e., a short term capital loss). *28 Section 166(d)(2) defines a nonbusiness bad debt as a debt other than (1) a debt created or acquired in connection with a trade or business of the taxpayer, or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. In this case petitioner occupied a dual status with respect to National. He was both an employee and a shareholder. His employee status constitutes a trade or business so that a loss proximately related to his employment would constitute a fully-deductible business loss. Section 1.166-5, Income Tax Regs. However, shareholder status does not constitute a trade or business, so advances made to protect petitioner's investment would, on becoming worthless, be nonbusiness bad debts deductible only as short term capital losses. Whipple v. Commissioner,373 U.S. 193, 202 (1963). "In determining whether a bad debt has a 'proximate' relation to the taxpayer's trade or business * * *, the proper measure is that of dominant motivation, and * * * significant motivation is not sufficient." United States v. Generes,405 U.S. 93, 103 (1972). We have found as a fact that petitioner's dominant motive *29 in advancing funds to National was to protect his investment. In reaching our conclusion we have considered all the facts and circumstances. For example, petitioner's gross salary from National was $6,250 in 1966 and $13,750 in 1967. [5] Yet in 1967 he advanced a total of $69,646, an amount substantially in excess of his total salary from National, and claims he did so to retain his job, not to protect his $40,000 investment. Petitioner was able to find other employment after he left the Kansas City Spurs outside the field of soccer, and did so at a salary higher than he had earned from National. Before becoming president of National he was a salesman and estimator of costs of *30 structural and ornamental steel, and even owned and operated his own small speciality steel company. After leaving the Kansas City Spurs, he traveled in Europe hiring skilled workers for American employers and hockey players for the Chicago Blackhawks. Petitioner thus was not in the position of having to make loans to National to save his only possible job. Cf.GeraldineR. Mann,34 T.C.M. 377, - P-H Memo. T.C. par. - (1975), and Charles J. Haslam,33 T.C.M. 482, 43 P-H Memo. T.C. par. 74,097 (1974). We recognize that the salary from National was petitioner's only income at the time he was working for the company. This fact alone is not enough to prove that his dominant motive in making the loans was to protect his job. Roy E. Knoedler,33 T.C.M. 443, 448, 43 P-H Memo. T.C. par. 74,085 at 74-417 (1974). While the question is not free from doubt, based on the record as a whole we conclude that petitioner has failed to carry his burden of proving that his dominant motive in making loans to National was to preserve his job rather than to preserve his investment. 2. Sale of Itasca Residence.
In May 1965 petitioner *31 acquired a residence in Itasca, Illinois, in trade for some apartment buildings he owned. Petitioner renovated the residnce, including installing a swimming pool, and sold it in 1968 for a $15,870 loss. Petitioner's family occupied this house as their residence from October 1965 until September 1968. Petitioner claimed an ordinary loss deduction on his 1968 return for the loss on the sale of the residence. Respondent contends the loss is a nondeductible personal loss, and we agree. Section 165(a) allows "as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(c) [6] limits the loss deduction in the case of individuals to losses incurred in a trade or business, losses incurred in any transaction entered into for profit, and casualty losses. *32 Petitioner claims that the loss he experienced on the sale of the Itasca property arose from a transaction entered into for profit. He claims he acquired the property in trade for business property, that he intended to renovate the property to sell it at a profit, and that the reason his family moved into the house was simply to protect it from vandals. Presumably most home buyers eventually plan to resell their house for a profit. Dupuy G. Warrick,44 B.T.A. 1068 (1941). The question is whether petitioner's profit motive was dominant when he purchased and occupied the house or whether it was acquired and held primarily for a residence. Austin v. Commissioner,298 F. 2d 583, 584 (2d Cir. 1962), affg. 35 T.C. 221 (1960). Petitioner, who has the burden of proof, has not established that his acquisition and retention of the Itasca property were primarily prompted by a concern for profit. The mere fact that petitioner acquired the residence in trade for property held for a profit does not convert a residence into for-profit property. Petitioner has not established that the residence was continuously listed for sale. Petitioner *33 at no time attempted to rent the premises. There is no showing that the renovations were made for resale as opposed to adapting the home to the needs and desires of petitioner's wife and children. Petitioner's family apparently permanently abandoned their prior home when they moved into the Itasca property, and the Itasca property remained their sole residence for approximately 3 years. Petitioner contends his family lived in the home solely to prevent vandalism. However, renting the property would also have deterred vandalism and would have been a course of action more consistant with a profit motive than occupying the house personally. The record does not indicate the extent or type of vandalism petitioner had to contend with. Finally, petitioner never took any depreciation deductions on the Itasca premises, although he did on other for-profit property. Phipps v. Helvering,124 F. 2d 292, 295 (D.C. Cir. 1941), affg. a Memorandum Opinion of this Court. We conclude on the record as a whole that petitioner held the property primarily as a residence at the time of sale, and the loss from the sale is a nondeductible personal expense. Decision will be entered *34 under Rule 155.
Footnotes
1. Respondent also determined additions to tax under section 6651(a) of $79.75 for 1968 and $248.66 for 1969. Petitioner has not contested these adjustments, and therefore they are deemed conceded.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2a. Petitioner's 1967 income tax return was not submitted into evidence.↩
3. Section 166(a) provides: (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. ↩
4. Section 166(d) provides: (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
5. Petitioner stated that his oral employment agreement provided in addition to salary a guarantee of "20 percent of the gross profit on the gate." There apparently was no gross profit. We conclude there is insufficient evidence to establish the 20 percent guarantee. Petitioner did not call Cutler to testify. Petitioner's testimony was imprecise and sometimes contradictory. We conclude that petitioner, who had the burden of proof, has failed to establish this aspect of the oral employment agreement.↩
6. Section 165(c) provides: Limitations on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. * * * ↩