WILLIS D. TAYLOR AND SANDRA B. TAYLOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Taylor v. Commissioner
Docket No. 35152-83
United States Tax Court
T.C. Memo 1989-331; 1989 Tax Ct. Memo LEXIS 327; 57 T.C.M. (CCH) 895; T.C.M. (RIA) 89331; July 11, 1989
*327 In 1973, petitioners guaranteed a $ 300,000 loan made to a partnership by a bank. The partnership transferred $ 140,000 of the loan proceeds to a medical clinic in which petitioner-husband practiced as a physician and held a substantial stock investment. The partnership did not engage in any trade or business. In 1973, petitioner-husband also borrowed $ 44,772 from the bank. The partnership and petitioner-husband defaulted on their respective loans. In settlement of their obligations on the personal loan and the guaranty, petitioners executed a $ 37,500 promissory note to the bank which had lent the monies. In 1979 and 1980, petitioners made payments on the $ 37,500 promissory note in the amounts of $ 11,001 and $ 8,000, respectively. Held: Petitioners' payments applied against the partnership debt gave rise to nonbusiness bad debts, deductible under sec. 166(d)(1) and not under secs. 166(f), 166(a), and 162, I.R.C. 1954. Robert E. Johnson, Roger L. Kessler, and Linda S. Nichols, for the petitioners. Reid M. Huey, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners *328 for 1979 and 1980 in the amounts of $ 7,975 and $ 8,860, respectively. After concessions by both sides, the issue for decision is the nature of the deductions to which petitioners are entitled under either section 162[1] or section 166, on account of payments made on a promissory note executed to a third party lender. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners Willis D. Taylor (hereinafter sometimes referred to as "Taylor") and Sandra B. Taylor, husband and wife, resided in Indianapolis, Indiana. Taylor has been a physician since 1964, spending all of his work time in that endeavor. From 1966 until after the years before the Court, Taylor was the chief physician for the Ford Motor Company plant in Indianapolis. The job qualification *329 for that position was to be a physician. Taylor also practiced at hospitals and emergency rooms. On April 17, 1970, articles of incorporation of Memorial Industrial Clinic, Inc. (hereinafter sometimes referred to as "Clinic"), were filed with the Secretary of State of Indiana. There were three initial incorporators of Clinic -- Taylor, Joseph E. Walther (hereinafter sometimes referred to as "Walther"), and Gerhard F. Yonkman (hereinafter sometimes referred to as "Yonkman"). Each of them was a physician licensed to practice in Indiana. On April 20, 1970, Taylor was elected president of Clinic; Walther, vice president; and Yonkman, secretary and treasurer. Each of them bought 100 shares of Clinic's stock for $ 400. Clinic opened for business about 1971. Clinic's business was to render professional medical services to patients who sought medical care. Taylor practiced medicine for Clinic from 1971 through December 15, 1977, and for Clinic's successor until 1982. Beginning in 1975, Taylor received compensation from Clinic based on 50 percent of medical fees that he generated. Yonkman practiced medicine for Clinic from 1971 into 1972 or 1973. Yonkman did not receive a salary *330 from Clinic for the medical services he provided. Walther did not practice medicine for Clinic. In addition to serving as Clinic's first president, Taylor served as Clinic's president from 1973 through September 30, 1978. Taylor did not receive any compensation for serving as Clinic's president. From October 1, 1973, through September 30, 1978, Taylor was the sole shareholder of Clinic. Clinic provided medical services at two different locations, 5941 E. 30th Street, Indianapolis (hereinafter sometimes referred to as "Eastside Clinic"), and a second location (hereinafter sometimes referred to as "Westside Clinic"). Westside Clinic was opened around 1973, operated for 6 months, and was thereafter closed because the expenses of its operation were greater than its income. On August 8, 1972, Willis D. Taylor and Associates (hereinafter sometimes referred to as "Associates"), a partnership, was formed. Taylor, Yonkman, and Phillip Tracy (hereinafter sometimes referred to as "Tracy") were partners in Associates. Tracy was an attorney who handled the business operations of Clinic and prepared its financial records until 1974. Associates was created to receive loan disbursements from *331 Merchants National Bank (hereinafter sometimes referred to as "Merchants") and to transfer the proceeds to Clinic. Merchants refused to lend $ 300,000 to Clinic without all three shareholders (Taylor, Yonkman, and Walther) guaranteeing the loan. Walther refused to guarantee the loan. However, Merchants agreed to lend the $ 300,000 to Associates. The only funds used to capitalize Associates were $ 300,000 of loan proceeds borrowed from Merchants in August 1972. Other than transferring the $ 300,000 loan proceeds, Associates did not conduct any business operations. In April 1973, Taylor used $ 71,364.73 of the loan proceeds to acquire 500 additional shares of Clinic stock. Taylor also used $ 8,220.09 to pay personal expenses. Tracy withdrew $ 80,000 of the loan proceeds as salary from Clinic. Taylor and Yonkman had not authorized Tracy's withdrawal. Associates transferred about $ 140,000 of the loan proceeds to Clinic, for which Clinic gave Associates an unsecured note bearing 10-percent interest per year with no specific maturity date nor a specific manner of repaying the principal amount. Clinic used the money to pay debts of Eastside Clinic, and also to buy equipment, supplies, *332 and pay salaries and operating expenses of Westside Clinic. Associates did not have any assets after the funds from Merchants were thus transferred. All the payments that were made on Associate's debt to Merchant before December 15, 1977 (see table 3, infra), both principal and interest, were made by Clinic. As of July 23, 1973, the loan balance, including accrued interest, owed by Associates to Merchants was $ 305,464.86. At some point in 1973, Yonkman, Taylor, and Tracy, were partners in Associates. After 1973, Yonkman and Tracy were no longer partners in Associates. However, Associates continued to file Partnership Information Returns, Form 1065, for 1972 through 1977, listing Taylor as 100-percent profit sharing partner of Associates on all of these tax returns. At least from 1973 onward, Taylor was the 100-percent "partner" in Associates. For 1972 through 1977, Taylor did not perform any services as an employee or otherwise for Associates nor did he receive any salary from Associates. For 1972 through 1977, Associates reported that it did not receive any income, and reported losses, on its partnership information tax returns as listed in table 1. Table 1 Year
Amount
1972
($ 41,113.80)
1973
(     500.00)
1974
(  43,916.62)
1975
(  42,116.64)
1976
(  64,320.00)
1977
(  57,304.00)
Total
($249,271.06)
Petitioners *333 deducted the 1972 through 1977 partnership losses on their individual income tax returns for each of the respective years. Attached to Associates' 1975, 1976, and 1977 information tax returns was the following statement: Page 1 - Line 6 - Interest Income
The partnership is receiving payments under a loan arrangement from Memorial Industrial Clinic of Indianapolis. Memorial Industrial Clinic is in a precarious financial condition, and the ultimate recovery of accounts due the partnership are precarious. Accordingly, the partnership has elected to apply all accounts received to principal, rather than recognize interest income, since the ultimate recovery of the entire amount of principal is seriously in doubt. Page 1 - Line 24 - Other Deductions
In prior years, the partnership borrowed substantial sums of money from Merchants National Bank and TrustCompany, Indianapolis, Indiana. During that period of time, substantial sums of money were invested to one Phillip E. Tracy, attorney. These funds were expended in ways in which no accounting has been given. Accordingly, since no assets have been acquired by the partnership, and since the prospect of any ultimate recovery from right *334 of offset against related parties or from any other source appears negligible, all payments made have been treated as expense to the partnership. Around 1970 or 1971, Taylor personally borrowed $ 20,000 from Peoples Bank and $ 65,000 from Merchants to be used to remodel Eastside Clinic, buy equipment, and provide operating capital for Eastside Clinic. Sometime before July 23, 1973, Taylor borrowed additional monies, which he used to buy a corner lot adjacent to Eastside Clinic (hereinafter sometimes referred to as "Parcel I"). As of July 23, 1973, the balance owed on the loans made by Merchants to Taylor was $ 44,772.26. Clinic also borrowed directly from Merchants. In 1971, Clinic borrowed $ 75,000 from Merchants to be used to capitalize Clinic's operations. As of July 23, 1973, the balance owed by Clinic to Merchants was $ 51,667.05. On July 23, 1973, Clinic, Tracy and his wife (hereinafter sometimes collectively referred to as "the Tracys"), Yonkman, Associates, and petitioners entered into a loan agreement (hereinafter sometimes referred to as "the 1973 loan agreement") with Merchants. The purpose of the 1973 loan agreement was to restructure the existing obligation to repay *335 Merchants the amounts previously borrowed by Clinic, Associates, and Taylor. Also on July 23, 1973, petitioners, Associates, and Clinic entered into a real estate mortgage with Merchants in connection with the 1973 loan agreement. In the real estate mortgage, petitioners granted to Merchants a mortgage on their personal residence (hereinafter sometimes referred to as "the mortgaged residence") and on Parcel I. Petitioners, Associates, and Clinic also granted Merchants a mortgage on another piece of real estate (hereinafter sometimes referred to as "Parcel II"). On July 23, 1973, Clinic, Associates, Yonkman, the Tracys, and petitioners entered into a continuing guaranty with Merchants in connection with the 1973 loan agreement (hereinafter sometimes referred to as "the 1973 continuing guaranty"). Pursuant to the terms of the 1973 continuing guaranty, Clinic, Associates, petitioners, Yonkman, and the Tracys personally guaranteed payment of the liabilities of petitioners, Associates, and Clinic. All the guarantors agreed to be jointly and severally liable for the then existing debts. Petitioners, Clinic, and Associates (but not Yonkman and the Tracys) also agreed to be jointly and *336 severally liable for future debts. The guaranty provides in part as follows: The Bank may, from time to time, without notice to the undersigned, * * * (c) extend or renew for any period (whether or not longer than the original period), alter or exchange any of the Liabilities, * * * whether or not the Bank shall have resorted to any property securing any of the Liabilities or any obligation hereunder or shall have proceeded against any other of the undersigned or any other party primarily or secondarily liable on any of the Liabilities. Promissory notes (hereinafter sometimes collectively referred to as "the 1973 promissory notes") were entered into, evidencing the obligations encompassed by the 1973 loan agreement. The 1973 promissory notes were between Merchants and (a) Clinic for the principal amount of $ 51,667.05; (b) Associates for the principal amount of $ 305,464.86; and (c) petitioners for the principal amount of $ 44,772.26. On February 9, 1976, Merchants, Clinic, Associates, petitioners, Yonkman, and the Tracys entered into a modification agreement, the purpose of which was to reschedule repayments of the 1973 promissory notes which were in default. The modification agreement *337 provides, in pertinent part, as follows: Rather then amending and modifying each of the Notes to reflect the agreed-to modifications in repayment and interest rate, the parties are agreeable that each of the Debtors execute a new substitute Note to evidence the indebtedness and containing the new terms. The payment of the indebtedness evidenced by the aforesaid Notes have been guaranteed to Bank by each of the other parties to this Agreement under an absolute and unconditional guaranty dated July 23, 1973 and delivered to Bank, which guaranty expressly provides that the Bank may, without notice, to the guarantors extend the time for the payment of the indebtedness and make other changes. Bank is agreeable to making an accommodation to the Debtors provided Bank's security and the obligations of the guarantors is not impaired and under the terms hereinafter contained. The modification agreement incorporates by reference the 1973 continuing guaranty. In connection with this incorporation, the modification agreement provides, in pertinent part, as follows: 5. It is acknowledged that the indebtedness evidenced by each of the New Notes are "liabilities" within the term and meaning of that *338 word as used in the continuing guaranty dated July 23, 1973 and executed by all of the parties to this Agreement (excepting Bank) in favor of Bank and that said guaranty embraces the indebtedness evidenced by the New Notes and that the signatories to the continuing guaranty are absolutely and unconditionally obligated to pay the indebtedness evidenced by the New Notes as and when they become due. In connection with the modification agreement, three new promissory notes (hereinafter sometimes collectively referred to as "the 1976 promissory notes") were entered into on February 11, 1976, between Merchants and (a) Clinic for the principal amount of $ 43,384.62 (hereinafter sometimes referred to as "the 1976 Clinic note"); (b) Associates for the principal amount of $ 256,451.89 (hereinafter sometimes referred to as "the 1976 Associates note"); and (c) petitioners for the principal amount of $ 37,595.45 (hereinafter sometimes referred to as "the Taylor business note"). The 1976 promissory notes superceded the 1973 promissory notes. On October 12, 1976, petitioners borrowed $ 30,000 from Merchants and executed a secured promissory note in that amount (hereinafter sometimes referred to *339 as "the Taylor personal note"). The proceeds of the Taylor personal note were used to settle business-related litigation involving the Westside Clinic and its equipment and office lessors. In 1977, petitioners were in default on the Taylor personal note. Also, in 1977, petitioners, Yonkman, the Tracys, Clinic, and Associates were in default on the 1976 promissory notes. On August 24, 1977, Merchants sued Clinic, Associates, the Tracys, Yonkman, and petitioners for failure to make the required installment payments on the 1976 promissory notes. In the same action, Merchants also sued petitioners on the Taylor personal note. On August 26, 1977, Merchants filed a lis pendens notice in connection with its suit to collect on the 1976 promissory notes. The properties encompassed by the lis pendens notice were the mortgaged residence, Parcel I, and Parcel II; Merchants held a mortgage on all three properties which was executed in connection with the 1973 loan agreement. On December 15, 1977, petitioners, Clinic, and Associates entered into a settlement agreement (hereinafter sometimes referred to as "the 1977 settlement agreement") with Merchants with respect to the August 26, 1977, *340 suit. As of December 15, 1977, the balances (principal and interest) owed on the 1976 promissory notes and the Taylor personal note were as listed in table 2. Table 2 Interest Thru
Note
Note
Principal
Dec. 15, 1977
Balance
1976 Clinic note
$  41,160.18
$  3,539.78   [2] $  44,699.96
1976 Associates note
202,900.60
17,449.45   220,350.05
Taylor business note
35,669.64
3,067.59   [3] 38,669.64
Taylor personal note
26,500.00
1,279.19   27,779.19
Total
$ 331,498.84 The 1977 settlement agreement provides, in pertinent part, as follows: (a) Petitioners agree to pay (concurrently with the 1977 settlement agreement) $ 28,279.19 to Merchants in satisfaction *341 of the $ 27,779.19 Taylor personal note balance plus $ 500 attorneys fees; (b) Clinic surrenders to Merchants its accounts receivable, inventory, and equipment, and consents to the sale (concurrently with the 1977 settlement agreement) of these assets to Gary C. Williams, M.D., Professional Corporation (hereinafter sometimes referred to as "Williams Clinic"), for $ 60,000; (c) Petitioners agree to deed Parcel I to Merchants in lieu of foreclosure and to be credited with a value of $ 10,000 towards the 1976 promissory notes; (d) Clinic, Associates, and petitioners agree to pay (concurrently with the 1977 settlement agreement) $ 84,220.81 to Merchants; (e) Petitioners agree to execute (concurrently with the 1977 settlement agreement) a promissory note agreeing to pay $ 37,500 at 9-1/4 percent interest (hereinafter sometimes referred to as "the $ 37,500 promissory note"). The $ 37,500 promissory note is to be secured by a second mortgage in favor of Merchants on the mortgaged residence; and (f) Merchants agrees to dismiss without prejudice its complaint against petitioners, and not institute any action against petitioners on these claims so long as petitioners satisfy the terms of the *342 $ 37,500 promissory note. The $ 60,000 sale proceeds, $ 10,000 credit, and $ 84,220.81 payment listed above in paragraphs (b), (c), and (d), respectively, were to be applied first against $ 2,500 in attorney's fee, then against the 1976 Associates note. This left a remaining balance due of $ 68,629.24 on the 1976 Associates note. Payments on the $ 37,500 promissory note were to be applied against the 1976 Associates note and the Taylor business note in the amount of $ 33,616.38 and $ 3,883.62, respectively; the remaining amounts on those notes ($ 35,013.64 on the 1976 Associates note and $ 4,045.03 on the Taylor business note) were to be forgiven. On April 9, 1979, petitioners paid $ 11,001.10 [4] to Merchants on account of the $ 37,500 promissory note. On June 23, 1980, petitioners paid $ 8,000 to Merchants on account of the $ 37,500 promissory note. In connection with *343 the Merchants law suit, on May 30, 1978, Yonkman settled his obligation under the 1973 continuing guaranty by paying $ 25,000 to Merchants. This payment was applied against the 1976 Clinic note. Also in connection with the Merchants lawsuit, on May 23, 1978, the Tracys agreed to settle their obligation under the 1973 continuing guaranty by paying $ 60,000 to Merchants, to be applied first against the 1976 Clinic note, and any excess against the Taylor business note. A history of the aforementioned loans and repayments is listed below in table 3. Table 3 Loan History * *344 1976 Associates
1976 Clinic
Taylor Business
Taylor Personal
Date
Note
Note
Note
Note
1970/1971 ** $ 75,000   **$ 85,000     8/72 ** $ 300,000   7/23/73 Bal.
305,465   51,667  44,772     2/11/76 Bal.
256,452   43,385  37,595     10/12/76 ** $ 30,000   12/15/77 Bal.
220,350   44,700  38,670     27,779   Repayment Schedule Pursuant to 1977 Settlement Agreement
a (60,000)  e (25,000) g 4,438     h 500   b (10,000)  f (60,000) i (28,279)  c (84,221)  g 5,121  d 2,500   Subtotal
68,629   j (35,179) 43,108     -0-   j (35,179)    k (33,616)  k (3,884)    Bal. Remaining l
$ 35,013   $   -0-   $  4,045     $   -0-    In order to buy Clinic's assets, Williams *345 Clinic executed a promissory note agreement and security agreement with American Fletcher National Bank and Trust Co., Indianapolis (hereinafter sometimes referred to as "American Fletcher"). Gary C. Williams (hereinafter sometimes referred to as "Williams") was the sole shareholder and president of Williams Clinic. In connection with the promissory note agreement with American Fletcher, Williams and Taylor signed a continuing guaranty for the obligations of Williams Clinic. Immediately before Williams Clinic bought Clinic's assets, the physicians employed at Clinic were Mary Jo Brandt, Williams, Taylor, and a radiologist. After Williams Clinic bought Clinic's assets on December 15, 1977, the physicians employed at Williams Clinic were Mary Jo Brandt, Williams, Taylor, and the radiologist. Taylor received compensation and other income for 1972 through 1980 from several sources, including the items shown on table 4. Table 4 Ford
Schedule
Schedule
Year
Salary
C * *346 E **
1972
$ 35,008
$ 74,466
--   1973
37,644
27,087
--   1974
40,592
17,165
$ (5,986)
1975
43,096
15,401
33,029 1976
48,590
39,970
10,023 1977
55,269
47,556
9,579 1978
55,264
39,916
(688)
1979
62,271
33,149
--   1980
60,829
46,121
--   In addition, Taylor had income from Taylor Emergency Hospital as shown on table 5. Table 5 Year
Dividends
Schedule E
1974
$ 21,786
$     695 1975
16,789
(13,111)
OPINION Petitioners contend that their payments on the $ 37,500 promissory note are deductible under section 162 as ordinary and necessary business expenses to protect Taylor's goodwill and credit as a physician. They contend in the alternative that they are entitled to deduct these payments under section 166 because the payments gave rise to debts which were worthless as soon as they arose. The bad debts are deductible in full from ordinary income, petitioners assert, because (1) Taylor's guaranty was made in order to protect his compensation as a physician and so the debts were business bad debts under the general rule of section 166(a), or (2)Taylor's guaranty, initially made in 1972 and reaffirmed in 1973, falls under the special rule of section 166(f) and section 1.166-8, Income Tax Regs.
Respondent contends that (1) Associates was not in a *347 trade or business and petitioners' personal use of part of the proceeds of the Associates loan shows that the predominant motive of their guaranty of that loan was not connected with a trade or business, (2) petitioners have failed to prove that petitioners' guaranty of Clinic's loan was made in Taylor's occupation as a physician, and (3) the Taylor business loan proceeds were used for real estate investment and not in Taylor's trade or business. Respondent contends that section 166 controls, not section 162; also he contends that section 166(f) and section 1.166-8, Income Tax Regs., do not apply because the status of petitioners' guaranties depends on the February 9, 1976, modification agreement and section 166(f) had already been repealed. We agree with respondent that section 166, not section 162, determines the deductibility of the payments on the $ 37,500 promissory note. We agree with petitioners that section 166(f) as in effect on December 13, 1975, potentially applies to the facts of the instant case; however, we agree with respondent that the payments are not deductible under section 166(f). We agree with respondent that the payments made on the $ 37,500 promissory note *348 and applied against the 1976 Associates note are deductible only as nonbusiness bad debts under section 166(d). Section 166 -- Bad Debt
In General
Section 166(a)[5] allows deductions for worthless debts. However, under section 166(d)(1)[6] *349 a nonbusiness bad debt is deductible by an individual only as a short-term capital loss. Under section 166(d)(2)[7], the debts that arose from petitioners' 1979 and 1980 payments are nonbusiness debts, unless they were acquired in connection with, or became worthless in, Taylor's trade or business. To be treated as a business debt, the debt must be proximately related to the taxpayer's trade or business. Whipple v. Commissioner,373 U.S. 193, 201 (1963); sec. 1.166-5(b), Income Tax Regs. The "proper measure [for such a relationship] is that of dominant motivation." United States v. Generes,405 U.S. 93, 103-105 (1972); Shinefeld v. Commissioner,65 T.C. 1092, 1096 (1976). Whether a debt is a nonbusiness or business debt is a question of fact. Sec. 1.166-5(b), Income Tax Regs. *350 Respondent's determination in the notice of deficiency that the debts were nonbusiness is presumed to be correct and petitioners have the burden of proving otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice & Procedure.
When a taxpayer pays the debt of another because of the taxpayer's prior guaranty of the debt, the debtor's obligation to the original creditor becomes an obligation to the taxpayer, generally by reason of the law of subrogation. Putnam v. Commissioner,352 U.S. 82, 85 (1956); Benak v. Commissioner,77 T.C. 1213, 1218 (1981); Gillespie v. Commissioner,54 T.C. 1025, 1031 (1970), affd. per unpublished order (CA9 1972). If the debtor cannot pay this shifted debt, which is not a new debt ( Putnam v. Commissioner,352 U.S. at 88-89), then the shifted debt is treated as becoming worthless at the time the taxpayer made the payment. Putnam v. Commissioner,352 U.S. at 89; secs. 1.166-8(a)(1) and 1.166-9(a) and (b), Income Tax Regs. In this context, the characterization of the debt as a business or nonbusiness debt, that is, whether the debt is proximately related to the taxpayer's trade or business, is based on the facts existing *351 when the guaranty was made. See Arrigoni v. Commissioner,73 T.C. 792, 799-800 (1980), and cases there cited. Sec. 166(f)
With respect to guaranties made before January 1, 1976, section 166(f)[8] *352 treats a guarantor's loss as a bad debt, to which section 166(d) does not apply, making it fully deductible from ordinary income if the requirements of section 166(f) are satisfied. Section 166(f) requires that (1) the guarantor not be a corporation; (2) the debt not be a corporate obligation; (3) the proceeds of the loan be used in the borrower's trade or business; and (4) the obligation of the borrower to the lender be worthless at the time the guarantor satisfies the obligation to the lender. Section 166(d) does not apply to a bad debt loss falling within the terms of section 166(f). However, if the requirements of section 166(f) are not met, then section 166(d) must be examined in order to determine how the bad debt is to be deducted. Section 166(f) was repealed by section 605 of the Tax Reform Act of 1976, effective for "guarantees made after December 31, 1975, in taxable years beginning after such date." After section 166(f) was repealed, a payment made by a taxpayer in discharge of that taxpayer's obligation as a guarantor is treated as a business bad debt if the guaranty agreement arises out of the guarantor's trade or business. Sec. 1.166-9(a), Income Tax Regs. *353 If the guarantor enters into a guaranty agreement in a transaction other than as part of the guarantor's trade or business, then the guarantor will be allowed to deduct the resulting loss as a nonbusiness bad debt. Sec. 1.166-9(b), Income Tax Regs.
The essential difference between the law under section 166(f) and the law after that provision's repeal for guaranties entered into after December 31, 1975, is that (1) under section 166(f), the test for whether a payment made on a guaranty results in an ordinary deduction depends on the use of the loan proceeds in the trade or business of the borrower, while (2) after section 166(f)'s repeal, the determination depends on the relationship between the guaranty and the guarantor's trade or business. Hence, under section 166(f) even if the guaranty is not proximately related to the guarantor's trade or business, the guarantor would receive an ordinary bad debt deduction for payments made on a guaranty if the proceeds of the loan which was guarantied were used in the trade or business of the borrower. Sec. 1.166-8(a)(1)(i), Income Tax Regs. If section 166(f) applies in the instant case, then petitioners would be given two bites at the people *354 in showing that the payments they made on the $ 37,500 promissory note gave rise to ordinary bad debt deductions. If petitioners fail to prove their entitlement to an ordinary bad debt deduction under section 166(f), then they could try to prove their entitlement to such a deduction under the general rules of section 166(a). In the instant case, payments on the $ 37,500 promissory note were to be applied against the 1976 Associates note and the Taylor business note in the amount of $ 33,616.38 and $ 3,883.62, respectively. [9] *356 The debt underlying the 1976 Associates note arose in August 1972 when Associates borrowed $ 300,000 from Merchants. Petitioners guaranteed repayment of Associates' borrowings when they entered into the 1973 continuing guaranty on July 23, 1973. This guaranty was made with respect to the 1973 promissory notes made between Merchants, Clinic, and Associates. The 1973 continuing guaranty explicitly provided that Merchants could extend or renew for any period and alter or exchange the 1973 promissory notes. The 1976 modification agreement replaced the 1973 promissory notes but did not replace the 1973 continuing guaranty. Rather, this guaranty was incorporated *355 into the terms of the modification agreement. The modification agreement also states that (1) the 1973 continuing guaranty continues to remain effective and "embraces" the 1976 promissory notes and (2) petitioners' obligations under the 1973 continuing guaranty are not "impaired" by the modification agreement. Thus, petitioners' obligations to repay the 1976 Associates note arose from the 1973 continuing guaranty which remained effective after petitioners and Merchants executed the modification agreement. Neither Merchants nor petitioners entered into a new guaranty agreement with respect to the 1976 Associates notes. We conclude that the repeal of section 166(f) does not apply to the 1973 continuing guaranty and to the bad debts in issue in the instant case. In the instant case, petitioners have not shown that all four requirements of section 166(f) *357 have been met. Specifically, petitioners have not shown that Associates was engaged in a trade or business. The Code does not contain an all-embracing definition of the term "trade or business". It is clear, however, that not every income-producing activity constitutes a trade or business. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Whipple v. Commissioner, 373 U.S. at 200-201. However, at a minimum, to be engaged in a trade or business as distinguished from a transaction entered into for profit, "the taxpayer must be involved in the activity with continuity and regularity and that taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. at 35. Associates was formed to borrow money from Merchants and transfer it to Clinic. Associates borrowed $ 300,000 from Merchants in August 1972 from which Associates transferred $ 140,000 to Clinic. Petitioners failed to present any evidence that Clinic actually compensated Associates for the $ 140,000 that Associates transferred to Clinic. Although Clinic gave Associates an unsecured promissory note bearing 10-percent interest for the proceeds, this note did not have *358 a specific maturity date nor did it specify the manner in which the principal would be paid back. Petitioners did not present any evidence showing that Associates transferred the $ 140,000 amount at a higher interest rate to Clinic than the interest rate Merchants charged Associates for the loan, whereby Associates could have realized a profit from the transaction. Associates did not report any interest income on this note (or any other income, for that matter) on the partnership information tax returns it filed for 1972 through 1977. Clinic made principal and interest payments directly to Merchants to repay the loan Associates borrowed from Merchants. The record is also void of any evidence that Tracy repaid the $ 80,000 that he withdrew without authorization, or that Taylor repaid to Associates the amounts of $ 71,364.73 and $ 8,220.09 that he used to buy Clinic stock and pay personal expenses, respectively. Associates reported losses on its partnership information returns for 1972 through 1977. (Table 1, supra.) Associates had no assets after funds from Merchants were transferred. Other than transferring the $ 300,000 loan proceeds, Associates did not conduct any business operations. *359 Thus, after Associates received the $ 300,000 loan from Merchants in August 1972 and transferred the proceeds, Associates' activities ceased. The foregoing clearly indicates that Associates' activities were not primarily engaged in for a profit nor did the activities have any continuity and regularity indicative of a trade or business. We conclude that Associates' activities did not constitute a trade or business. We hold for respondent that petitioners are not allowed ordinary bad debt deductions under section 166(f). Sec. 166(d)
We must next determine whether the payments petitioners made pursuant to the $ 37,500 promissory note applied against the 1976 Associates note for which they were liable under the 1973 continuing guaranty are deductible under the general rules of section 166(d). When petitioners made these payments which were used to pay Associates' debts, Associates' obligation to Merchants became an obligation to petitioners. Putnam v. Commissioner, 352 U.S. at 85; Benak v. Commissioner, 77 T.C. at 1218; Gillespie v. Commissioner , 54 T.C. at 1031. In the instant case, the characterization of the debt as a business or nonbusiness debt, that is whether the debt is proximately *360 related to petitioners' trade or business, is based on the facts existing at the time the guaranty was made on July 23, 1973. [10]
Since petitioners do not contend that they were in the trade or business of guaranteeing or making loans for profit, we may dispense with the section 166(d)(2)(B) exception without further ado. Estate of Byers v. Commissioner, 57 T.C. 568, 575 (1972), affd. 472 F.2d 590 (CA6 1973). We consider whether section 166(d)(2)(A) applies; i.e., whether the debt was created or acquired in connection with a trade or business of Taylor. When the 1973 continuing guaranty was made, Taylor was practicing as a physician for the Ford Motor Company, for hospitals and emergency rooms, and for Clinic. The record is void of any evidence that petitioners' guaranty was proximately related to Taylor's *361 practice of medicine at the Ford Motor Company and at the hospitals and emergency rooms. With respect to Taylor's practice of medicine at Clinic, petitioners must show that petitioners' dominant motivation in guarantying Associates' loan was proximately related to Taylor's status as an employee (i.e., practicing physician) of Clinic rather than as an investor in Clinic. United States v. Generes, supra; Benak v. Commissioner, 77 T.C. at 1216; Shinefeld v. Commissioner, 65 T.C. at 1097-1099; Estate of Byers v. Commissioner, 57 T.C. at 577-579. The fact that a loan or payment is made in furtherance of an employer's trade or business does not mean that it is proximately related to the trade or business of the employee. Benak v. Commissioner, supra; Shinefeld v. Commissioner, supra.Of the $ 300,000 borrowed by Associates in August 1972, $ 80,000 was withdrawn by Tracy and we do not have an accounting of Tracy's expenditures. Taylor used $ 8,220.09 to pay personal expenses. Thus, $ 88,220.09 was never transferred to Clinic and petitioners' guaranty thereof was not proximately related to Taylor's practice of medicine at Clinic. Of the remainder of the $ 300,000 loan, $ 71,364.73 was used *362 by Taylor to buy additional stock in Clinic. This fact indicates that petitioners' dominant motivation as to the $ 71,364.73 was to enhance Taylor's investment interest as a shareholder in Clinic, as distinct from his relationship of practicing medicine for Clinic. See Shinefeld v. Commissioner, supra; Imel v. Commissioner, 61 T.C. 318, 325 (1973); Estate of Byers v. Commissioner, supra.Finally, only $ 140,000 of the $ 300,000 Associates loan was transferred to and used by Clinic in the operations of Eastside Clinic and Westside Clinic. When petitioners entered into the guaranty, Taylor had a substantial stock investment in Clinic of about $ 72,000. Although Taylor practiced medicine for Clinic, he did not receive any salary for his services until 1975. Also, Taylor did not receive any salary for serving as president of Clinic from April 17, 1970, through September 30, 1978. These facts show that Associates' loan was not guaranteed in order to protect Taylor's salary, as distinguished from protecting Taylor's investment in Clinic. We conclude that petitioners' dominant motivation in guaranteeing Associates' loan stemmed from Taylor's role in Clinic as an investor, rather than his *363 trade or business as an employee or officer of Clinic. Petitioners argue that the instant case is similar to Mann v. Commissioner, T.C. Memo. 1975-74 (34 T.C.M. 377, 44 P-H Memo T.C. par. 75,074 at 75-371). In Mann, the taxpayer-employee (who owned 50 percent of his employer-corporation's stock and was vice president and a member of the board of directors of the employer-corporation) was allowed a business bad debt deduction for loans that he made to the employer-corporation because we found that his dominant motivation in lending the money was to insure his continued employment and salary. In reaching our holding this Court stated as follows (34 T.C.M. at 381-382, 44 P-H Memo T.C. par. 75,074 at 75-376): We are equally impressed by the situation of a taxpayer looking to one source of income for his livelihood. The lack of an alternative source of income coupled with the distinct possibility that petitioner might not find other employment in his trade supports the importance placed upon the retention of employment. * * * Petitioner, on the other hand sought to protect an annual after-tax salary in 1964 of $ 22,000 by advancing $ 38,500 on an investment of $ 11,600. The disparity *364 between petitioner's annual after-tax salary of $ 22,000 and an investment of $ 11,600 tends to show motivation toward the protection of the salary. [Fn. refs. omitted.] Petitioners argue that a comparison of (1) the $ 37,500 amount of the promissory note that Taylor signed on December 15, 1977, with (2) Taylor's compensation from Williams Clinic in 1978, 1979, and 1980, shows that petitioners' dominant motivation was toward protection of compensation, as opposed to investment. Petitioners' argument and reliance on Mann is misplaced. The character of the payments as giving rise to nonbusiness or business bad debts depends on petitioners' dominant motivation when petitioners entered into the 1973 continuing guaranty, not petitioners' motivation when they signed the $ 37,500 promissory note. [11] Petitioners' obligations to pay the 1976 promissory notes for which they executed the $ 37,500 promissory note arose from the 1973 continuing guaranty. Petitioners neither assumed nor guaranteed the 1976 Associates note when they executed the $ 37,500 promissory note; rather, they were merely satisfying their obligations under the 1973 continuing guaranty. Focussing on the facts that existed *365 when the 1973 continuing guaranty was made, we cannot conclude that the disparity between Taylor's annual after-tax salary from Clinic in 1973 of zero and petitioners' $ 72,000 investment in Clinic "tends to show motivation toward the protection of the salary." In addition, unlike the situation in Mann, in 1973 Taylor had two alternative sources of income; (1) from practicing medicine at the Ford Motor Company and (2) from his general practice. See table 4, supra. [12] *366 We conclude that this Court's opinion in Mann serves to emphasize the shortcomings in petitioners' case and not to bolster their case. Finally, petitioners argue that in determining the characterization of the payments as business versus nonbusiness debt, the substance rather than the form of the transaction must be analyzed. Specifically, petitioners assert that the proceeds from the loans to Associates, Clinic, andTaylor were all used for the operation and purchase of equipment for the medical clinics operated by Taylor. Petitioners are apparently contending that Associates was formed merely as a conduit to obtain funds for Clinic which *367 Clinic itself could not obtain directly from Merchants. On answering brief, petitioners state that "The substance and reality of all these transactions was to finance the operations and assets of Dr. Taylor's trade or business of being a physician and operating a clinic in which to practice. * * * When viewed as a whole, it is clear that the substance of these transactions were loans made to and for the benefit of [Taylor's] trade or business followed by repayment of the loans from income generated by that business". Petitioners contend we should focus on the transactions made by Associates, Clinic, andTaylor as all part of Taylor's integrated medical practice, rather than focussing on and analyzing separately each loan made to Associates, Clinic, andTaylor. At the start of the trial, the following discussion took place between the Court and petitioners' counsel: THE COURT: * * * does either side contend that [A]ssociates was a separate entity at any time period that's relevant to this case? * * * MR. JOHNSON: Petitioner's does believe it was an entity, and we were required to file the Form 1065's. THE COURT: And this -- MR. JOHNSON: It was an information return, I recognize -- *368 THE COURT: I know not a separate tax-paying entity, but the Petitioners are contending that it is -- was a separate entity, so that there could indeed be transactions between outsiders and [A]ssociates that were not, that are not to be treated as transactions between outsiders and Dr. Taylor. And there could be transactions between Dr. Taylor and [A]ssociates. MR. JOHNSON: That is correct, Your Honor. In fact, some of the stipulated documents are between [A]ssociates and an outsider, rather than Dr. Taylor and an outsider. Petitioners are reversing the position they advocated at trial and now argue that we should disregard Associates and analyze the transactions as between Merchants, on the one hand, and Clinic and Taylor on the other hand. For the reasons that follow we refuse to do this. The record is contrary to petitioners' assertions that Associates merely acted on behalf of Clinic. Of the $ 300,000 borrowed by Associates from Merchants, only $ 140,000 of the proceeds were actually transferred to Clinic, andClinic gave Associates a 10-percent unsecured note for the $ 140,000 transfer. One borrowing as an agent for another would not normally relend the money to the principal *369 but would most likely simply transfer the money to the principal (probably while receiving some other type of compensation for services performed as an agent). The remaining $ 160,000 was taken by Tracy and Taylor who used the money for investment, personal, and other unaccounted purposes and not simply for the benefit of Clinic. The transactions between Associates and Merchants also indicate that, when Associates borrowed the $ 300,000 from Merchants, Associates was a separate entity which did not operate as a conduit or agent of Clinic. Cf. Bollinger v. Commissioner,108 S. Ct. 1173 (1988). Merchants loaned $ 300,000 directly to Associates. Petitioners did not present any evidence showing that Merchants loaned this money to Associates acting as an agent of Clinic. To the contrary, each of the two times Merchants renegotiated repayment of the $ 300,000, it required Associates to execute a new promissory note. Also, during Associates' apparent existence from 1972 through 1977, petitioners beneficially availed themselves of Associates' reported losses and deducted $ 249,271.06 of Associates' losses on their individual income tax returns. We cannot conclude from the foregoing facts *370 that transactions between Merchants and Associates were in substance transactions between Merchants, Clinic, andTaylor. We hold for respondent on this issue. Section 162 - Trade or Business Expenses
Petitioners' argument that the payments made on the $ 37,500 promissory note are deductible as ordinary and necessary business expenses under section 162(a)[13] is without merit. Where section 166 is applicable, "Congress has legislated specially" ( Putnam v. Commissioner,352 U.S. at 87), and application of the general business deduction authority of section 162(a) is superceded. Horne v. Commissioner,523 F.2d 1363, 1366 (CA9 1975), affg. 59 T.C. 319, 333, 336 (1972). Thus, "a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." Putnam v. Commissioner,352 U.S. at 88. In the instant case, because payments on the $ 37,500 promissory note that *371 are applied against the 1976 Associates note which petitioners guaranteed gives rise to a debtor-creditor relationship between petitioners and Associates, we conclude section 166 applies exclusively to such payments and that such payments are not deductible under section 162. Petitioners cite a number of cases for the proposition that section 162 deductions may be available in certain circumstances where one taxpayer pays a debt of another. The distinction between such cases and the instant case, where petitioners' payments are based on a guaranty, is explained in Roussel v. Commissioner,37 T.C. 235, 242-243 (1961). Section 166 crowds out section 162 (and sections 165 and 212). Horne v. Commissioner, supra.
We hold for respondent on this issue. To take account of concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue. Section 166(f)↩, although generally repealed after 1975, remained in effect for 1979 and 1980 as to bad debts resulting from guaranties made before 1976.
2. In addition to the 1976 Clinic note balance, interest due after December 15, 1977, through May 23, 1978, was $ 5,121.09. ↩
3. In addition to the Taylor business note balance, interest due after December 15, 1977, through May 23, 1978, was $ 4,437.96. The sum of the principal and interest through December 15, 1977, on the Taylor business note is $ 38,737.23, which exceeds the note balance by $ 67.59. The parties have not explained the difference. Our findings, including those on table 3, infra,↩ are in accord with the numbers that appear on the stipulated exhibit.
4. Respondent proposed a finding that this payment was $ 11,100, and petitioners state that they have no objection thereto. On answering brief, respondent insists that the correct amount is $ 11,100. Our finding ($ 11,001.10) is in accordance with the stipulated copy of the check by which petitioners made the payment.↩
*. The amounts are rounded to the nearest dollar. ** These amounts are the monies borrowed by Associates, Clinic, andTaylor. a Proceeds of Clinic sale (accounts receivable, inventory, and equipment) to Williams Clinic. b $ 10,000 credit on Parcel I deed to Merchants. c Amount paid by petitioners, Associates, and Clinic pursuant to 1977 settlement agreement. d Attorney's fee pursuant to 1977 settlement agreement. e Amount paid by Yonkman pursuant to his settlement with Merchants. f Amount to be paid by the Tracys pursuant to their settlement agreement with Merchants. g Accrued interest after December 16, 1977, through May 23, 1978. h Attorney's fee charged on the Taylor personal note. i Amount paid by petitioners pursuant to the 1977 settlement agreement. j Amounts in excess of the 1976 Clinic note to be applied against the Taylor business note, pursuant to the settlement agreement with the Tracys in 1978. k $ 37,500 promissory note petitioners agreed to pay pursuant to the 1977 settlement agreement. Petitioners made payments of $ 11,001 and $ 8,000 in 1979 and 1980, respectively. l Pursuant to the 1977 settlement agreement, Merchants was to forgive these remaining balance.↩
*. 1975-1977 -- Clinic; 1978-1980 -- Williams Clinic. All the schedule C amounts are net of business expenses deducted on petitioners' tax returns. ** Clinic subchapter S undistributed taxable income and loss.↩
5. SEC. 166. BAD DEBTS. (a) General Rule. -- (1) Wholly worthless debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. ↩
6. SEC. 166. BAD DEBTS. * * * (d) Nonbusiness Debts. -- (1) General rule. -- In the case of a taxpayer other than a corporation -- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year. [The subsequent amendment of this provision by section 1001(b)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 1011, does not affect the instant case.] ↩
7. SEC. 166. BAD DEBTS. * * * (d) Nonbusiness Debts. -- * * * (2) Nonbusiness debt defined. -- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than -- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
8. Section 166(f), as in effect for guaranties made before January 1, 1976, provides as follows: SEC. 166. BAD DEBTS. * * * (f) Guarantor of Certain Noncorporate Obligations. --A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment. [Sec. 166(f) was repealed by sec. 605 of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1575. (Former sec. 166(g) was redesignated as sec. 166(f)↩.) The repeal applies to guaranties made after December 31, 1975, in taxable years beginning after this date.]
9. In 1979 and 1980, petitioners made payments of $ 11,001.10 and $ 8,000, respectively. The record is unclear as to whether the payments made on the $ 37,500 promissory note were to be applied first against the Taylor business note then against the 1976 Associates note, or vice versa, or pro rata. If the total payments of $ 19,001 were applied first against the 1976 Associates note, then no part of these payments would offset the Taylor business note. Respondent determined that all the petitioners' 1979 and 1980 payments on the $ 37,500 promissory note are short-term capital losses incurred in the years the payments were made. Respondent has not contended that any such payments allocable to the Taylor business note are totally nondeductible. Payments allocable to the Taylor business note would reduce petitioners' obligation to Merchants founded on their own borrowing from Merchants. Payments on one's own obligation does not give rise to a bad debt deduction, because no debt owed to the taxpayer has become worthless. Perry v. Commissioner, 92 T.C. 470, 479 (1989), and cases cited therein. The Supreme Court has reached the same result from a different direction, stating as follows: "When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer. When he fulfills the obligation, the repayment of the loan likewise has no effect on his tax liability." Commissioner v. Tufts, 461 U.S. 300, 307↩ (1983).
10. Petitioners contend that there was a previous guaranty in 1972, and the 1973 continuing guaranty continued the 1972 guaranty. The evidence is largely silent on this point and so we have analyzed the application of section 166(d)(2) by reference to 1973. As we view the facts, our conclusions would be the same if we were to test section 166(d)(2)↩ against the situation as of 1972.
11. We note that petitioners made this very point when they persuaded us to consider the application of section 166(f). We agreed with them in that issue that 1973 motivation controlled over 1976 and 1977 motivation. Petitioners' 1973 motivation controls also for purposes of applying section 166(d)↩. 12. On brief, petitioners state as follows: The same conclusion [as in Mann v. Commissioner, T.C. Memo. 1975-74] can be drawn from Dr. Taylor's signing of a $ 37,500 promissory note on December 15, 1977 when compared to his salary from Dr. Williams' clinic corporation in the next three years 1978, 1979, and 1980 in the respective amounts of $ 55,264, $ 62,271 and $ 60,829. As table 3, supra, makes clear, those are the amounts of Taylor's salary from Ford -- his earnings from Williams Clinic averaged only two-thirds as much as his salary from Ford. In Mann, we stressed that the taxpayer's total gross income came from the business there in question. In Mann, we distinguished United States v. Generes, 405 U.S. 93 (1972), where only 30 percent of the taxpayer's gross income came from the business there in question. In the instant case, for the 3 years that petitioners have focussed on in the statement we quote, the factual setting is far closer to Generes than to Mann↩.
13. Section 162(a) provides, in relevant part, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *↩