HARVEY D. BERNSTEIN AND MARTHA J. BERNSTEIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bernstein v. Commissioner
Docket No. 31667-86
United States Tax Court
T.C. Memo 1989-422; 1989 Tax Ct. Memo LEXIS 420; 57 T.C.M. (CCH) 1270; T.C.M. (RIA) 89422; August 14, 1989
Gerald H. Lean, for the petitioners. Robert A. Miller, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioners' Federal income tax in the amount of $ 23,202 for taxable year 1983. After concessions, the sole issue for decision is whether petitioners are entitled to business bad debt deductions in the total amount of $ 89,846 *421 for the taxable year in issue on account of certain payments made by petitioner Harvey D. Bernstein ("petitioner") to or on behalf of a corporation owned by petitioner and his father. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition in the instant case was filed, petitioners resided in Randallstown, Maryland. During taxable year 1983 petitioner owned 50 percent of the outstanding shares of stock of Bernstein Holding Company, Inc. (the "company"), and petitioner's father owned the remaining shares. Petitioner was president of the company during the years 1973 to at least 1978 and materially participated in the activities of the company. Petitioner also was engaged in the business of selling and developing real estate from July 1971 through at least 1978, in addition to being employed by the company after its formation. The company was formed in 1973 as a Maryland corporation. At that time each of four shareholders contributed $ 20,000 to the capital of the company. Sometime prior to 1976, the shares of stock in the company held by *422 two of the shareholders were redeemed, leaving petitioner and his father as the sole shareholders. The company was engaged in the business of developing land. It bought large tracts of land in western Pennsylvania and western Maryland, subdivided them into 5- or 10-acre lots, made minimal improvements, such as access roads, and then sold the lots to the public. Upon the sale of a lot, the company normally received a small down payment from the purchaser and a note for the balance of the purchase price. The purchase money notes then were sold ("discounted") to various local banks with recourse, upon petitioner's personal guarantee. At other times, the company obtained loans which were secured by the purchase money notes. In 1976, the company began experiencing financial problems, and the banks with which the company normally dealt refused to purchase the company's purchase money notes or lend money to the company. On November 18, 1976, petitioner began advancing money to the company and making payments to its creditors and, by September 7, 1978, had advanced a total of $ 105,119.89 to or on behalf of the company ("the advances"). Petitioner testified that the advances were *423 evidenced by notes and that the terms of the notes "were always one year." Petitioner, however, failed to offer any such notes as evidence at trial. Certain of the company's purchase money notes were discounted to Maryland National Bank (the "bank"), and petitioner guaranteed payment of such notes to the bank (the "guaranteed notes"). Petitioner, however, failed to offer the guaranteed notes as evidence at trial. On May 2, 1977, the bank called upon petitioner to pay $ 40,685.72 on the guaranteed notes. In order to raise the money to make that payment, petitioner borrowed $ 40,685.72 from the bank and secured the loan with a second mortgage on his home. The bank had petitioner endorse the check representing the proceeds of that loan, and the proceeds thereupon were disbursed by the bank to itself in satisfaction of the guaranteed notes. On October 11, 1978, the company filed a petition in bankruptcy under Chapter XI of the Bankruptcy Act. The total market value of the assets listed on that petition was shown as $ 1,314,814.50 and the sum of the liabilities listed on the petition was shown as $ 822,000.00. The advances were listed as a part of those liabilities. The company's *424 motivation in filing for bankruptcy was (1) to gain protection from creditors because the company was not able to pay its debts as they matured and (2) to give the company time to sell more lots and realize the full market value of the land owned by the company. The company's Chapter XI Bankruptcy was converted to a Chapter X Bankruptcy on August 10, 1979. On October 1, 1980, a Joint Plan of Reorganization was filed in the Chapter X proceeding by the company and Black Walnut Farms, Inc., another corporation owned by petitioner and his father. On May 21, 1981, a Modified Joint Plan of Reorganization was filed in the Chapter X proceeding by the company and Black Walnut Farms, Inc. On January 22, 1982, the company and Black Walnut Farms, Inc., filed a Second Modified Joint Plan of Reorganization, which the Court approved in June 1983. Petitioner's claim against the company for the advances was classified as a Class 19 claim, the last class in order of priority under the plan. On November 14, 1978, an involuntary petition in Bankruptcy was filed against petitioner under Chapter VII of the Bankruptcy Act, and petitioner was adjudicated bankrupt as of that date by order dated January 10, 1979. *425 The Statement of Affairs for Bankrupt Engaged in Business, filed by petitioner in the Chapter VII case on January 29, 1979, did not list as part of petitioner's assets either the advances or the $ 40,685.72 paid to the bank in satisfaction of the guaranteed notes held by the bank. During the pendency of petitioner's personal bankruptcy, a consent judgment was filed on December 20, 1982, whereby judgment was entered against petitioner in the amount of $ 15,845.63 in favor of the bank. Under the terms of the consent judgment, petitioner agreed that the judgment was nondischargeable in his personal bankruptcy pursuant to section 17a of the Bankruptcy Act. The consent judgment was made in satisfaction of notes held by the bank that were guaranteed by petitioner. Petitioner, however, failed to offer any such notes as evidence at trial. An Order of Satisfaction was filed on January 27, 1986, indicating that the judgment had been satisfied. The record does not disclose the actual date the consent judgment was satisfied. OPINION The issue for decision is whether section 166[1] entitles petitioners to deductions for business bad debts in taxable year 1983 on account of the advances *426 to the company, the amounts paid on the guaranteed notes, or the amount paid in satisfaction of the consent judgment. Section 166 provides for deductions against ordinary income for business bad debts that become worthless during the year. Respondent argues that the advances and the amounts paid on the guaranteed notes and to satisfy the consent judgment were contributions to capital and, therefore, no genuine debt exists to which section 166 can apply. Petitioners contend that the advances and the amounts paid on the guaranteed notes and the consent judgment gave rise to debt obligations to which section 166 applies. Because we view the treatment of the debt/equity issue with respect to the advances differently than we do with respect to the guaranteed notes and consent judgment, we shall discuss them separately. The Advances
Each case involving the question of whether a payment *427 is debt or equity for Federal tax purposes must be decided on its own facts. Segel v. Commissioner, 89 T.C. 816, 827 (1987). Petitioners have the burden of proof. Rule 142(a). In Raymond v. United States, 511 F.2d 185, 189 (6th Cir. 1975), the court provided a helpful summary of the law regarding the deductibility of advances: When a taxpayer makes advances to a corporation which subsequently becomes insolvent, the transactions may be treated in three different ways by the Internal Revenue Code of 1954, depending upon the character of the advances and the dominant motive of the taxpayer in making them. If an advance is a contribution to capital, the amount of the contribution is added to the basis of the stock, Int.Rev.Code of 1954, sec. 1011, and if it becomes worthless, the shareholder is entitled to a capital loss equal to the basis in the stock. Int.Rev.Code of 1954, sec. 165(a). If the advance is a genuine debt, the treatment of it when it becomes worthless is governed by section 166 of the Int.Rev.Code *428 of 1954. A loss arising from a nonbusiness bad debt, one not created or acquired in connection with the taxpayer's trade or business, is treated as a short-term capital loss. A business bad debt, one created or acquired in the taxpayer's trade or business, is treated as an ordinary loss and may, accordingly, be deducted in full against ordinary income. In order to show that a loss was created or acquired in connection with his trade or business, a taxpayer must show that he made the loan either to protect his employment or as part of an established business of financing corporations. E.g. United States v. Generes, 405 U.S. 93, 92 S. Ct. 827, 31 L.Ed.2d 62 (1972), Whipple v. Commissioner, 373 U.S. 193, 83 S. Ct. 1168, 10 L.Ed.2d 288 (1963), Townshend v. United States, 384 F.2d 1008, 181 Ct. Cl. 635 (1967), Holtz v. Commissioner, 256 F.2d 865 (9th Cir. 1958). Where section 166 is applicable, "Congress has legislated specially", and deductibility under the authority of other Code sections is superseded. Putnam v. Commissioner, 352 U.S. 82, 87 (1956); Horne v. Commissioner, 523 F.2d 1363, 1366 (9th Cir. 1975), *429 affg. 59 T.C. 319, 333, 336 (1972). Thus, "a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." Putnam v. Commissioner, 352 U.S. at 88. [2]
Because appeal of this case would lie with the United States Court of Appeals for the Fourth Circuit, we will look to the factors discussed by that court in deciding debt/equity issues. Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. on another issue 445 F.2d 985 (10th Cir. 1971). In Road Materials, Inc. v. Commissioner, 407 F.2d 1121, 1125 (4th Cir. 1969), the court set forth factors which it viewed as important: the lack of principal and interest payments, the absence of a maturity date, the doubtful prospects of repayment, the debt-equity ratio, and the unlikelihood of obtaining loans of similar security from disinterested investors. In the instant case, petitioners failed to offer any notes or other written evidence *430 of indebtedness, although petitioner did testify that the advances were evidenced by one-year notes. Even were we to accept that notes existed, we believe that the labels of one sort or another used by a taxpayer are entitled to little weight in our deciding the issue of whether a true debt exists. Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). The professed intent of the shareholder also generally is given short shrift in favor of other more objective factors. Segel v. Commissioner, supra at 829 n.16. In Road Materials Inc. v. Commissioner, supra at 1124, the Fourth Circuit stated: The fact that the advances were entered as loans on the books kept by the taxpayer and [the corporation] does not conclusively prove they were loans. Nor was the Tax Court required to accept the testimony of the taxpayer's witnesses that it was the intention of the parties to create a debtor-creditor relationship. Intention to create a debt cannot be so readily proved. Generally it depends upon whether contemporaneous facts, not testimony given years later, establish an unconditional obligation to repay the *431 advances. In litigated cases the issue often is not free from doubt, and decision must be based on analysis of the entire record. This is especially required when the nominal debtor and creditor are controlled by the same person, and the arm's length dealing that characterizes the money market is lacking. For this reason, the substance of the transaction is controlling, not the form in which it is cast or described. And, contrary to the taxpayer's claim, this is so even though the advances were evidenced by bookkeeping entries that [state] law recognizes as debt. [Citations and fn. ref. omitted.] Applying the factors discussed in Road Materials, petitioners have not shown that there were any principal or interest payments, or for that matter, whether the obligations bore any interest. "Such a disinterest in interest points to a 'contribution to capital conclusion.'" Segel v. Commissioner, supra at 833. Petitioner testified that at the time the advances were made, he thought the land owned by the company was sufficiently valuable to pay off its debts if the land could be sold at its fair market value; however, no evidence of the land's value was *432 offered. We therefore are unable to conclude that the company's prospects of repayment of the advances were other than doubtful or that the company's debt-equity ratio would support characterization of the advances as debt. While the advances were not proportional to petitioner's interest in the company because petitioner only owned 50 percent of the company's stock, we give little weight to such a factor because the other 50 percent of the company's stock was owned by petitioner's father. See Kean, Transferee v. Commissioner, 91 T.C. 575, 595 (1988); Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 378 (1973). Moreover, the advances were made to the company when it was experiencing financial problems, and banks had refused any further credit. "[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms." Segel v. Commissioner, supra at 828. We find that as an economic reality the advances in the instant case were placed at the risk of the business of the company and that it is unlikely that disinterested investors would have made *433 loans to the company on terms similar to those on which the advances were made. Accordingly, we hold that the advances are capital contributions rather than debts to which section 166 could apply. Our holding obviates the need to address the parties' other arguments with respect to the advances, e.g., whether 1983 was the proper year for deduction or whether the dominant motive for making the advances was related to any trade or business of petitioner. [3]
The Guaranteed Notes and Consent Judgment
We now consider the amounts paid on the guaranteed notes and the consent judgment. Under the general rule a debtor-creditor relationship would have arisen upon payment by petitioner, because petitioner would have become subrogated to the bank's claims against either the makers of the notes or the company, depending upon the terms of petitioner's guarantee. Putnam v. Commissioner, 352 U.S. at 85. Compare sec. 1.166-9(c), Income Tax Regs. Once payment is found, "The deduction is allowed not *434 because of the payment as guarantor, but because the payment gives rise to a claim which if worthless constitutes a bad debt." Crown v. Commissioner, 77 T.C. 582, 598 (1981). A worthless debt arising from satisfaction of a guarantee generally is deductible in the year payment pursuant to the guarantee is made. Putnam v. Commissioner, supra at 89; sec. 1.166-9(a), Income Tax Regs.[4] When a guarantee agreement provides for subrogation rights, however, deduction is proper only in the year such rights become worthless. Sec. 1.166-(e)(2), Income Tax Regs. In the instant case, petitioners have failed to prove either that payment occurred in 1983 or that any subrogation rights became worthless in that year. We have found as a fact that petitioner borrowed $ 40,685.72 from the bank, via a second home mortgage, in order to satisfy his guarantee to the bank. It is well settled that substitution of a guarantor's personal note for that of a primary obligor, in *435 satisfaction of the guarantor's guarantee, does not constitute an outlay permitting a worthless debt deduction by the guarantor until he actually pays on the note. Crown v. Commissioner, supra; Eckert v. Burnet, 283 U.S. 140 (1931); Perry v. Commissioner, 49 T.C. 508 (1968). Petitioner therefore must show that he repaid the borrowed funds before he is entitled to a deduction. The only evidence of repayment is the second mortgage given by petitioner in 1977 to secure his obligation to pay the bank the $ 40,685.72. The terms of the second mortgage obligated petitioner to pay $ 727.60 per month until the obligation was paid in full; however, petitioner has not offered any credible evidence to prove that he paid any portion of the second mortgage in 1983 or, for that matter, in any other year. Furthermore, the guaranteed notes are not a part of the record. In fact, the record is devoid of any information about the terms of the guaranteed notes; the security for the guaranteed notes, if any; the details of the circumstances under which the guaranteed notes "went bad"; whether petitioner recovered any amounts from the makers *436 of the guaranteed notes; or, if the guaranteed notes were secured, whether petitioner recovered any of the lots in foreclosure proceedings. [5]
Petitioners thus have failed to prove that the guaranteed notes became worthless during 1983, or, for that matter, that the guaranteed notes ever became worthless. Rule 142(a). We therefore hold that petitioners have failed to prove their entitlement to any deduction for the $ 40,685.72. With respect to the $ 15,845.63 consent judgment entered on December 20, 1982, the record shows that a satisfaction was entered on January 27, 1986, but *437 the record does not show that it actually was paid during 1983. Petitioner only testified that it "was paid." He did not say when it was paid, and we cannot infer that it was paid in 1983 or at any other time prior to the entry of the satisfaction in 1986. In sum, petitioners have not proved their entitlement to any deduction under section 166 for taxable year 1983. Rule 142(a). To reflect the foregoing and concessions by respondent, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Taylor v. Commissioner, T.C. Memo. 1989-331↩.
3. Petitioners do not argue that any loss with respect to the advances is deductible as a loss from a worthless security under section 165(g)↩.
4. Taylor v. Commissioner, T.C. Memo. 1989-331↩.
5. Petitioner's testimony with respect to the guaranteed notes is vague at best: Q Okay, and the reason why there was no entry into a repayment schedule was because of the precarious financial condition of the corporation, isn't that correct? A No, I don't think that was the reason . I believe the reason, and I'm not a hundred percent sure because we're going back so many years, but I think it was the fact that I was going to try and collect on these notes because some of these people had property of their own and I was going to go after them, which later I wasn't able to do, and I don't remember.↩